**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**June 7, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

GREGORY TUCKER,

     Plaintiff - Appellee,

v.

FAITH BIBLE CHAPEL
INTERNATIONAL, d/b/a Faith Christian
Academy, Inc.,

     Defendant - Appellant.

------------------------------------

EUGENE VOLOKH; ROBERT J.
PUSHAW; RICHARD W. GARNETT;
ROBERT COCHRAN; ELIZABETH A.
CLARK; THE ASSOCIATION OF
CHRISTIAN SCHOOLS
INTERNATIONAL; THE COLORADO
CATHOLIC CONFERENCE;
RELIGIOUS LIBERTY SCHOLARS;
JEWISH COALITION FOR RELIGIOUS
LIBERTY; PROFESSOR ASMA UDDIN;
NATIONAL WOMEN'S LAW CENTER;
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES; AMERICAN SEXUAL
HEATH ASSOCIATION; CALIFORNIA
WOMEN LAWYERS; DC COALITION
AGAINST DOMESTIC VIOLENCE;
DESIREE ALLIANCE; EQUAL RIGHTS
ADVOCATES; EQUALITY
CALIFORNIA; EQUITY FORWARD;
FORGE, INC.; GLBTQ LEGAL
ADVOCATES & DEFENDERS; HUMAN

No. 20-1230

RIGHTS CAMPAIGN; IN OUR OWN VOICE; NATIONAL BLACK WOMEN'S REPRODUCTIVE JUSTICE AGENDA; KWH LAW CENTER FOR SOCIAL JUSTICE AND CHANGE; LATINOJUSTICE PRLDEF; LEGAL AID AT WORK; LEGAL VOICE; MUSLIMS FOR PROGRESSIVE VALUES; NARAL PRO-CHOICE AMERICA; NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM; NATIONAL ASSOCIATION OF SOCIAL WORKERS; NATIONAL COALITION AGAINST DOMESTIC VIOLENCE; NATIONAL ORGANIZATION FOR WOMEN FOUNDATION; NEW YORK LAWYERS FOR THE PUBLIC INTEREST; PEOPLE FOR THE AMERICAN WAY FOUNDATION; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; REPRODUCTIVE JUSTICE ACTION COLLECTIVE; SERVICE EMPLOYEES INTERNATIONAL UNION; SPARK REPRODUCTIVE JUSTICE NOW!, INC.; UJIMA INC.; THE NATIONAL CENTER ON VIOLENCE AGAINST WOMEN IN THE BLACK COMMUNITY; WOMEN EMPLOYED; WOMEN LAWYERS ON GUARD INC.; WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA; WOMEN'S BAR ASSOCIATION OF THE STATES OF NEW YORK; WOMEN'S INSTITUTE FOR FREEDOM OF THE PRESS; THE WOMEN'S LAW CENTER OF MARYLAND; WOMAN'S LAW PROJECT; WV FREE, CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER; NATIONAL EMPLOYMENT LAWYERS ASSOCIATION; THE EMPLOYEE RIGHTS ADVOCACY INSTITUTE FOR LAW & POLICY, AND

2

THE INSTITUTE FOR
CONSTITUTIONAL ADVOCACY AND
PROTECTION,

    Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:19-CV-01652-RBJ-STV)**

_____

Daniel H. Blomberg (Daniel D. Benson and Christopher Mills, The Becket Fund for
Religious Liberty, Washington, D.C., and Christopher J. Conant and Robert W. Hatch,
Hatch Ray Olsen Conant LLC, Denver, Colorado, with him on the briefs), The Becket
Fund for Religious Liberty, Washington, D.C. for Defendant-Appellant.

Bradley Girard (Richard B. Katskee, Americans United for Separation of Church and
State, and Bradley A. Levin, Jeremy A. Sitcoff, and Peter G. Friesen, Levin Sitcoff, PC,
Denver, CO, with him on the brief), Americans United for Separation of Church and
State, Washington, D.C., for Plaintiff-Appellee.

_____

Before **BACHARACH**, **EBEL**, and **McHUGH**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

This appeal presents a single jurisdictional issue: Whether Appellant Faith
Bible Chapel International can bring an immediate appeal under the collateral order
doctrine challenging the district court's interlocutory decision to deny Faith summary
judgment on its affirmative "ministerial exception" defense. Faith operates a school,
Faith Christian Academy ("Faith Christian"). Plaintiff Gregory Tucker, a former
high school teacher and administrator/chaplain, alleges Faith Christian fired him in
violation of Title VII (and Colorado common law) for opposing alleged race

3

discrimination at the school.  As a religious employer, Faith Christian generally must comply with anti-discrimination employment laws.  But under the affirmative "ministerial exception" defense, those anti-discrimination laws do not apply to employment disputes between a religious employer and its ministers.  Here, Faith Christian defended against Tucker's race discrimination claims by asserting that he was a "minister" for purposes of the exception.

The Supreme Court deems the determination of whether an employee is a "minister" to be a fact-intensive inquiry that turns on the particular circumstances of a given case.  Here, after permitting limited discovery on only the "ministerial exception," the district court ruled that, because there are genuinely disputed material facts, a jury would have to resolve whether Tucker was a "minister."  Summary judgment for Faith Christian, therefore, was not warranted.  Faith Christian immediately appealed that decision, seeking to invoke our jurisdiction under the collateral order doctrine.

The Supreme Court has stated time and again that the collateral order doctrine permits a narrow exception to the usual 28 U.S.C. § 1291 requirement that we only review appeals taken from final judgments entered at the end of litigation.  In deciding whether the collateral order doctrine permits immediate appeals from the category of orders at issue here—orders denying summary judgment on the "ministerial exception" because there remain disputed issues of material fact—we must weigh the benefit of an immediate appeal against the cost and disruption of allowing appeals amid ongoing litigation.  After conducting that balancing, we

4

determine that we do not have jurisdiction to consider this interlocutory appeal. Instead, we conclude the category of orders at issue here can be adequately reviewed at the conclusion of litigation.

In deciding that we lack jurisdiction, we reject Faith Christian's arguments, which the dissent would adopt. Faith Christian seeks to justify an immediate appeal first by making the novel argument that the "ministerial exception" not only protects religious employers from liability on a minister's employment discrimination claims, but further immunizes religious employers altogether from the burdens of even having to litigate such claims. In making this argument, Faith Christian deems the "ministerial exception" to be a semi-jurisdictional "structural" limitation on courts' authority to hear Title VII claims. On that basis, Faith Christian then draws an analogy between the decision to deny Faith Christian summary judgment on its "ministerial exception" defense and those immediately appealable decisions to deny government officials qualified immunity from suit under 42 U.S.C. § 1983.

We reject both steps of Faith Christian's argument. The Supreme Court has made clear that the "ministerial exception" is an affirmative defense to employment discrimination claims, rather than a jurisdictional limitation on the authority of courts to hear such claims. Further, the "ministerial exception" is not analogous to qualified immunity available to government officials. The Supreme Court has only permitted immediate appeals from the denial of qualified immunity when the issue presented for appeal is one of law, not fact. Here, on the other hand, the critical question for

purposes of the "ministerial exception" is the fact-intensive inquiry into whether Tucker was a minister.

Moreover, the reason that the Supreme Court permits immediate appeals from the denial of qualified immunity is to protect, not individual government officials, but rather the public's interest in a functioning government. That public interest is not present when a private religious employer seeks to avoid liability under Title VII from employment discrimination claims.

Faith Christian's (and the dissent's) argument for application of the collateral order doctrine here contradicts several well-established lines of Supreme Court precedent establishing that

- the question of whether an employee is a minister is a fact-intensive inquiry, rather than a legal determination, see Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049, 2066–67 (2020);

- the collateral order doctrine applies only narrowly, usually to review legal, rather than factual, determinations, see Johnson v. Jones, 515 U.S. 304, 307, 309–10, 313–18 (1995);

- qualified immunity protects only government officials, see Wyatt v. Cole, 504 U.S. 158, 167–68 (1992), not private religious employers; and

- the "ministerial exception" is an affirmative defense, not a limitation on courts' authority to hear Title VII cases, see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 195 n.4 (2012).

We cannot, and should not, ignore these well-established lines of Supreme Court precedent and, therefore, we reject Faith Christian's (and the dissent's) arguments for application of the collateral order doctrine here. We conclude, instead,

6

that we lack jurisdiction over this interlocutory appeal and, therefore, DISMISS this appeal.

## I.  BACKGROUND

### A. Relevant Facts

Faith Christian Academy is a Christian school offering Bible-based education from kindergarten through high school.  The students and staff come from a wide array of religious perspectives.

Tucker began teaching high school science at the school in 2000.  Later he also taught courses entitled "Leadership" and "Worldviews and World Religions."  In 2014, Faith Christian hired Tucker for the additional job of chaplain, a position also referred to as the Director of Student Life.  In 2017, Tucker was assigned the additional task of planning Faith Christian's weekly "Chapel Meetings."

In January 2018, Tucker conducted a chapel meeting—he calls it a symposium—on race and faith.  Although Faith Christian initially congratulated Tucker on the presentation, that presentation was not well-received by some parents and students.  As a result, the school relieved Tucker of his duties preparing and conducting weekly chapel meetings and soon thereafter removed him from his position as Director of Student Life.  At the end of February 2018, the school also fired him from his teaching position.

### B.  Procedural Posture

Tucker filed a complaint with the Equal Employment Opportunity Commission and, after receiving a right-to-sue letter, sued Faith Christian.  Tucker asserted two

causes of action relevant here: 1) a claim under Title VII of the Civil Rights Act of 1964, alleging that the school fired him in retaliation for opposing a racially hostile environment; and 2) a Colorado common law claim for wrongful termination in violation of public policy.[1]

At the outset of this litigation, Faith Christian moved to dismiss the action under Fed. R. Civ. P. 12(b)(6), asserting the "ministerial exception."  The exception is rooted in the First Amendment, which "bar[s] the government from interfering with the decision of a religious group to fire one of its ministers."  Hosanna-Tabor, 565 U.S. at 181; see also Our Lady, 140 S. Ct. at 2060–61.  The "ministerial exception" is "not a jurisdictional bar" that might abort the traditional judicial process.  Hosanna-Tabor, 565 U.S. at 195 n.4.  Instead, it "operates as an affirmative defense to an otherwise cognizable claim . . . because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'"  Id. (quoting Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 254 (2010)).

Because it is well established that a religious employer does not "enjoy a general immunity from secular laws," Our Lady, 140 S. Ct. at 2060, the "ministerial exception" does not preclude discrimination claims brought by a religious employer's non-ministerial employees.  See, e.g., Rayburn v. Gen. Conf. of Seventh-Day Adventists, 772 F.2d 1164, 1169 (4th Cir. 1985) (recognizing Title VII applies to a

---

[1] Tucker also asserted a claim under Title VI of the 1964 Civil Rights Act, which the district court dismissed.  That dismissal is not at issue in this appeal.

8

religious institution's "secular employment decisions"), cited favorably in

Skrzypczak v. Roman Catholic Diocese, 611 F.3d 1238, 1245–46 (10th Cir. 2010).

The "ministerial exception" is triggered only when the plaintiff-employee in a Title

VII case qualifies as a "minister."

Here, Faith Christian asserted its affirmative "ministerial exception" defense in

a Rule 12(b)(6) motion to dismiss, but the district court converted that motion into

one for summary judgment under Fed. R. Civ. P. 56.  The court then permitted

limited discovery only on the questions of whether Faith Christian is a religious

employer entitled to assert the "ministerial exception" and whether Tucker qualified

as a minister.  After the parties addressed those questions, the district court denied

Faith Christian summary judgment, ruling that, while Faith Christian could assert the

"ministerial exception," the question of "whether Mr. Tucker was a 'minister' within

the meaning of the 'ministerial exception' is genuinely disputed on the evidence

presented."  (Aplt. App. 284; see also id. (stating "that there is a genuine dispute of

material fact as to whether Mr. Tucker was a 'minister'").)  The district court later

denied Faith Christian's motion for reconsideration.[2]  Faith Christian immediately

---

[2] There are at least three questions underlying the determination of whether the
"ministerial exception" applies in a given case: 1) Is the employer a religious
organization entitled to assert the "ministerial exception" defense? 2) Is the employee
a "minister"? And 3) is the claim that the employee is asserting against the employer
the type of claim that is subject to the "ministerial exception"?  As to the first
question, Tucker does not challenge on appeal the district court's ruling that Faith
Christian could invoke the "ministerial exception."  It is the second question—
whether Tucker qualifies as a "minister—that is the subject of this appeal.  As to the
third question, no one disputes that Tucker's Title VII and state law wrongful
discharge claims are subject to the "ministerial exception."  See Puri v. Khalsa, 844

9

appealed both decisions, invoking our jurisdiction under 28 U.S.C. § 1291 based on

the collateral order doctrine.[3]

## II. DISCUSSION

This case presents an important jurisdictional question of first impression for

this Court: whether a decision denying a religious employer summary judgment on its

"ministerial exception" defense constitutes an immediately appealable final order

under the collateral order doctrine.  Ultimately, we answer that question in the

negative and conclude we lack appellate jurisdiction to consider this interlocutory

appeal.

In reaching that conclusion, we: (A) address the scope of this appeal, which

involves the "ministerial exception"; (B) discuss general collateral-order-doctrine

principles, the only justification Faith Christian invokes in support of its

interlocutory appeal; and (C) apply those collateral-order principles to the category of

---

F.3d 1152, 1158 (9th Cir. 2017) (recognizing "ministerial exception" applies to state law causes of action "that would otherwise impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers." (quoting Bollard v. Cal. Province of the Soc'y of Jesus, 196 F.3d 940, 950 (9th Cir. 1999))); Conlon v. InterVarsity Christian Fellowship, 777 F.3d 829, 836 (6th Cir. 2015) (holding "ministerial exception can be asserted as a defense against state law claims").

[3] Faith Christian has not invoked 28 U.S.C. § 1292(b), which permits a litigant to ask the district court to certify that the interlocutory "order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

orders at issue here, orders denying summary judgment on the "ministerial exception" defense.

## A. The Scope of This Appeal

We first review what is at issue in this appeal—and what is not. Namely, this appeal involves only Faith Christian's affirmative defense under the "ministerial exception," not a defense under the broader church autonomy doctrine. Although the two defenses share a common heritage, they are distinct defenses; we constrain our analysis here to the "ministerial exception." We begin by reviewing the similarities and differences between the two defenses.

### 1. The "Ministerial Exception" and the Church Autonomy Doctrine

Both defenses are grounded in the First Amendment, which

> protect[s] the right of churches and other religious institutions to decide matters "'of faith and doctrine'" without government intrusion. Hosanna-Tabor, 565 U.S. at 186 (quoting Kedroff [v. St. Nicholas Cathedral of Russian Orthodox Church], 344 U.S. [94,] 116 [(1952)]). . . .
>
> The independence of religious institutions in matters of "faith and doctrine" is closely linked to independence in what we have termed "'matters of church government.'" [Hosanna-Tabor,] 565 U.S. at 186. This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles.

Our Lady, 140 S. Ct. at 2060.

The "ministerial exception" is a narrower offshoot of the broader church autonomy doctrine; it only precludes employment discrimination claims brought by a "minister" against his religious employer.

11

> [A] church's independence on matters "of faith and doctrine" requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities. Without that power, a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith. The ministerial exception was recognized to preserve a church's independent authority in such matters.

Id. at 2060–61 (footnote omitted); see also Hosanna-Tabor, 565 U.S. at 196. The "ministerial exception," then, is an exception to employment discrimination laws which would otherwise apply to a religious employer when the employment dispute involves a minister.

Like the church autonomy doctrine, the "ministerial exception" "operates as an affirmative defense to an otherwise cognizable claim." Hosanna-Tabor, 565 U.S. at 195 n.4. While these defenses are related, the threshold question for determining when they apply differs. "Before the church autonomy doctrine is implicated, a threshold inquiry is whether the alleged misconduct is 'rooted in religious belief.'" Bryce v. Episcopal Church in the Diocese of Colo., 289 F.3d 648, 657 (10th Cir. 2002) (quoting Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)). The "ministerial exception," on the other hand, applies in one sense more broadly because it applies regardless of whether the dispute is rooted in religious belief, but the exception also applies more narrowly only to employment discrimination claims asserted by a minister. See id. at 654 n.2. The threshold determination for applying the "ministerial exception" is whether the plaintiff-employee qualifies as a "minister." See id.

The Supreme Court has made clear, in both Hosanna-Tabor and Our Lady, that this threshold determination of whether an employee is a "minister" for purposes of the "ministerial exception" requires a fact-intensive inquiry into the specific circumstances of a given case. See Our Lady, 140 S. Ct. at 2067 ("call[ing] on courts to take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the exception"); see also id. at 2063 (stating that, "[i]n determining whether a particular position falls within the Hosanna-Tabor exception, a variety of factors may be important."); id. at 2066 (noting that in Our Lady "[t]here is abundant record evidence that [the plaintiffs-employees] both performed vital religious duties," discussing that evidence at length); Hosanna-Tabor, 565 U.S. at 190–94 (considering, in significant detail, "all the circumstances of [the employee's] employment").

Following those Supreme Court decisions, a number of circuit courts have also recognized the fact-intensive nature of this inquiry. See Grussgott v. Milwaukee Jewish Day Sch., Inc., 882 F.3d 655, 657–58 (7th Cir. 2018) (per curiam) (stating that "whether Grussgott's role as a Hebrew teacher can properly be considered ministerial is subject to a fact-intensive analysis" required by Hosanna-Tabor); Fratello v. Archdiocese, 863 F.3d 190, 206–10 (2d Cir. 2017) (conducting fact-intensive inquiry into whether employee was a minister); Cannata v. Catholic Diocese, 700 F.3d 169, 176 (5th Cir. 2012) (noting that "the Hosanna-Tabor Court engaged in a fact-intensive inquiry and explicitly rejected the adoption of a 'rigid formula' or bright-line test"); E.E.O.C. v. Roman Catholic Diocese, 213 F.3d 795,

13

801 (4th Cir. 2000) (pre-Hosanna-Tabor) ("While the ministerial exception promotes the most cherished principles of religious liberty, its contours are not unlimited and its application in a given case requires a fact-specific inquiry."); see also Clement v. Roman Catholic Diocese, No. CV 16-117 Erie, 2017 WL 2619134, at *4 n.3 (W.D. Pa. June 16, 2017) (unreported) (stating that "the Supreme Court's decision in Hosanna-Tabor makes clear that the application of the ministerial exception requires a factual inquiry to determine if the employee qualifies as a 'minister'"). This court, too, has treated the question of whether an employee qualifies as a "minister" as a fact question. See Skrzypczak, 611 F.3d at 1243–44.

Contrary to all this authority, Faith Christian, as well as the dissent, deems the determination of whether an employee is a minister instead to present a question of law rather than fact. In reaching that conclusion, the dissent relies on three cases, none of which come from the United State Supreme Court. First, the dissent relies on Conlon, a case decided post-Hosanna-Tabor but before Our Lady. There, the Sixth Circuit stated that "whether the [ministerial] exception attaches at all is a pure question of law which this court must determine for itself." 777 F.3d at 833 (6th Cir. 2015). Conlon, however, made that statement in a Fed. R. Civ. P. 12(b)(6) context, where every determination is a legal one. Id. Further, as previously noted, a number of other circuits courts, following the Supreme Court, have instead recognized the fact-intensive inquiry necessary to determine whether a plaintiff-employee was a "minister."

14

Second, the dissent mentions Skrzypczak, 611 F.3d 1238 (10th Cir. 2010), a pre-Hosanna-Tabor case. A review of the Skrzypczak opinion indicates that the Tenth Circuit treated the question of whether the plaintiff-employee was a minister for purposes of the "ministerial exception" as one of fact. The Tenth Circuit, in that pre-Hosanna-Tabor case, applied the Fourth Circuit's general standard for determining who qualifies as a minister—"any employee who serves in a position that 'is important to the spiritual and pastoral mission of the church.'" Skrzypczak, 611 F.3d at 1243 (quoting Rayburn, 772 F.2d at 1169 (4th Cir.)). In upholding summary judgment for the religious employer under that standard, Skrzypczak first considered the employer's evidence of the plaintiff-employee's job duties, determining that that "evidence . . . tends to show her position was not limited to a merely administrative role, but it also involved responsibilities that furthered the core of the spiritual mission of the Diocese." 611 F.3d at 1243. That was sufficient evidence under the Fourth Circuit's standard to prove that the plaintiff-employee was a minister, shifting the burden to the plaintiff-employee, in opposing summary judgment, to "bring forward specific facts showing a genuine issue for trial." Id. (quoting Kannady v. City of Kiowa, 590 F.3d 1161, 1169 (10th Cir. 2010)). Skrzypczak concluded only that the plaintiff-employee there had not met her burden because the only evidence she proffered were three deficient affidavits:

> All three affidavits contain identical language, beginning with the conclusion that "[Appellant's] job was purely administrative," and continuing with the statement, taken almost verbatim from Rayburn, that "[the job] in no way required or involved a primary function of teaching, spreading the faith,

15

control of church governance, supervision of a religious order, or supervision or participation in religious ritual in worship." (Appellant's App. at 161–65.)

> "To survive summary judgment, nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir.1995) (internal quotation marks omitted). Despite Appellant's contentions, these affidavits are exactly the type of conclusory affidavits that are insufficient to overcome summary judgment. Even if we accept [that] these affidavits are based on personal knowledge, they do not set forth any facts, admissible or otherwise, that a court could consider as raising a material issue of fact. Instead, each affidavit merely parrots a general rule that a court could consider in determining the ministerial exception's application and then states, in the affiant's opinion, the legal conclusion the court should reach. Accordingly, we hold the district court did not err in its determination that Appellant was a minister for purposes of the exception.

Id. at 1244. Although Skrzypczak uses the phrase "legal conclusion" in describing the plaintiff-employee's deficient affidavits, the overall opinion treats the question of whether the plaintiff-employee qualified as a "minister" as a factual determination. Different from that case, here Tucker, in opposing summary judgment, submitted evidence to support his assertion that he was not a minister.

Lastly, the dissent relies on a pre-Our Lady case from the Kentucky Supreme Court, Kirby v. Lexington Theological Seminary, 426 S.W.3d 597, 608–09 (Ky. 2014), which applied state law to conclude that whether an employee is a minister is a question of law. That state-law case is not persuasive in the face of two U.S. Supreme Court cases, Our Lady and Hosanna-Tabor, as well as the Tenth Circuit decision in Skrzypczak, treating the determination of whether a religious entity's employee is a minister as a fact-intensive inquiry.

16

The cases on which the dissent relies, then, are not persuasive. We, therefore, treat the question of whether Tucker is a minister, for purposes of applying the "ministerial exception," as a fact-intensive inquiry rather than a straight legal conclusion.[4]

With this general legal framework in mind, we now turn to the circumstances of the case before us.

### 2. The Defense Asserted in This Case is Only a "Ministerial Exception" Defense and Not a Church Autonomy Defense

Faith Christian, in its converted summary judgment motion, asserted only a "ministerial exception" defense and, importantly, the limited discovery and summary judgment pleadings focused only on that issue.[5] In its motion for reconsideration, Faith Christian continued to assert the "ministerial exception" defense, but also for the first time referred, perfunctorily, to a defense under the broader church autonomy doctrine. On appeal, Faith Christian now relies on both defenses and, at times, lumps them together.

---

[4] The dissent, as well as Faith Christian and amici, gloss over the fact that the threshold question that triggers the application of the exception—whether the plaintiff-employee qualifies as a minister—requires a fact-intensive inquiry. In light of that, there will often be cases (like the case before us) where the district court will be unable to resolve that threshold question at the motion-to-dismiss or summary-judgment stage of litigation. In those cases, the jury will have to resolve the factual disputes and decide whether an employee qualifies as a "minister" before the affirmative "ministerial exception" defense is triggered.

[5] In arguing on appeal that it has asserted a church autonomy defense all along, Faith Christian only points to several sentences in its converted summary judgment motion taken out of context.

17

Faith Christian, however, has not adequately developed a factual record for asserting the church autonomy defense.  In particular, there has been no record development on that defense's necessary threshold question: whether the employment dispute between Tucker and Faith Christian is rooted in a difference in religious belief or doctrine.  Further, the parties only briefly and very generally alluded to the nature of their dispute in their pleadings.  In his amended complaint, for example, Tucker alleged that Faith Christian fired him in retaliation for Tucker opposing race discrimination at the school.  Faith Christian asserted in its answer, filed <u>after</u> the district court denied Faith Christian summary judgment on the "ministerial exception," that it fired Tucker because it disagreed with the biblical interpretations upon which he relied in his "Race and Faith" presentation.  Faith Christian makes that argument again in its appellate briefs.  Tucker counters that, prior to his firing, Faith Christian never raised concerns about any religious message he conveyed as part of the "Race and Faith" presentation and, instead, the school's administration told Tucker that his firing was an economic decision based on his offending too many tuition-paying parents and their children.  Whether or not Faith Christian's conflict with Tucker was rooted in religious belief, then, is directly disputed and the facts underlying that question have not yet been developed.  Therefore, because Faith Christian did not adequately assert or develop a defense under the church autonomy doctrine in the district court, that defense is not properly before us.  <u>See</u> <u>Rumsey</u> <u>Land Co. v. Res. Land Holdings, LLC (In re Rumsey Land Co.)</u>, 944 F.3d 1259, 1271

18

(10th Cir. 2019) (noting this Court will "not address arguments raised in the District Court in a perfunctory and underdeveloped manner") (quotation marks omitted).

Faith Christian argues in its reply brief that it cannot forfeit a defense under the church autonomy doctrine. (Aplt. Reply Br. 17 (citing Lee v. Sixth Mount Zion Baptist Church. 903 F.3d 113, 118 n.4 (3d Cir. 2018) (holding religious institution cannot "waive" "ministerial exception")).) We do not need to address that argument in this case because here the problem is not forfeiture. The problem here is instead that, because of the procedural posture of this case and because Faith Christian waited until its motion for reconsideration to refer, only perfunctorily, to the church autonomy doctrine, Faith has not adequately asserted or developed a defense under that doctrine. Neither party has yet had an adequate opportunity to address the threshold question presented by such a defense, whether the parties' employment dispute is "'rooted in religious belief,'" Bryce, 289 F.3d at 657 (quoting Yoder, 406 U.S. at 215).[6] Here, therefore, we address only a "ministerial exception" defense, which applies only when a "minister" sues his or her religious employer for violating anti-discrimination employment laws.[7]

---

[6] In a different context, the dissent notes that several circuits have held that a religious employer cannot waive (or forfeit) a "ministerial exception" defense. But this circuit has never addressed that question, and we need not do so here because there is no issue of waiver or forfeiture in the case before us.

[7] Whether a religious employer can take an immediate appeal under the collateral order doctrine from a district court's decision not to dismiss claims based on the church autonomy doctrine presents difficult questions that differ from the issues we must address here. Because the church autonomy doctrine is not at issue here, Faith Christian's and the dissent's reliance on cases addressing that doctrine and the

19

Having thus defined the scope of this appeal, we now turn to the legal question it presents: whether the collateral order doctrine permits Faith Christian's immediate interlocutory appeal from the district court's decision to deny summary judgment on the "ministerial exception" defense. Before answering that question, we first review the general principles of the collateral order doctrine.

## B. The Collateral Order Doctrine Generally

The general principles of the collateral order doctrine are familiar. As an Article III court created by Congress, we "possess only such jurisdiction as is conferred by statute." Edward H. Cooper, 15A Federal Practice & Procedure ("Wright & Miller") § 3901 (2d ed. updated Apr. 2021). Here, the statutory basis for appellate jurisdiction is 28 U.S.C. § 1291, which grants "courts of appeals . . . jurisdiction of appeals from all final decisions of the district courts." The district court's decision at issue here, denying Faith Christian summary judgment because there remain genuinely disputed issues of material fact that must be resolved by a fact-finder, obviously does not fit the usual definition of a "final decision"—"one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," Catlin v. United States, 324 U.S. 229, 233 (1945).

Faith Christian instead invokes the collateral order doctrine, "an expansive interpretation of [§ 1291's] finality requirement" first announced in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949), which allows appeals "from

principles underlying that doctrine are not helpful in resolving the issue presented in this appeal.

20

orders characterized as final . . . even though it may be clear that they do not terminate the action or any part of it." Wright & Miller, 15A Federal Practice & Procedure § 3911. To be immediately appealable, such orders "must [1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978) (numbers added), superseded on other grounds by rule as stated in Microsoft Corp. v. Baker, 137 S. Ct. 1702, 1708–10 (2017).

Immediate appeals under the collateral order doctrine are disfavored; they "are the exception, not the rule" because

> too many interlocutory appeals can cause harm. An interlocutory appeal can make it more difficult for trial judges to do their basic job—supervising trial proceedings. It can threaten those proceedings with delay, adding costs and diminishing coherence. It also risks additional, and unnecessary, appellate court work either when it presents appellate courts with less developed records or when it brings them appeals that, had the trial simply proceeded, would have turned out to be unnecessary.

Johnson, 515 U.S. at 309. Because of these concerns, the collateral order doctrine only applies to a "small class" of decisions "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Cohen, 337 U.S. at 546.

Courts, then, "must apply" the collateral order doctrine "with an eye towards preserving judicial economy and avoiding 'the harassment and cost of a succession of

21

separate appeals from the various rulings' in a single case." Los Lobos Renewable

Power, LLC v. AmeriCulture, Inc., 885 F.3d 659, 664 (10th Cir. 2018) (quoting Will

v. Hallock, 546 U.S. 345, 350 (2006)).  Emphasizing how small the class of

immediately appealable collateral orders is, this Court has noted that, "[i]n case after

case in year after year, the Supreme Court has issued increasingly emphatic

instructions that the class of cases capable of satisfying this 'stringent' test should be

understood as 'small,' 'modest,' and 'narrow.'"  Kell v. Benzon, 925 F.3d 448, 452

(10th Cir. 2019) (quoting United States v. Wampler, 624 F.3d 1330, 1334 (10th Cir.

2010)).

Of particular relevance here, the Supreme Court has recognized that when, as

here, the order being appealed involves the issue of whether there exists genuinely

disputed fact questions, the benefit of an immediate appeal is likely outweighed by

the cost of disrupting the ordinary course of litigation.  In the qualified immunity

context, for example, the Court has recognized the benefit of an immediate appeal

from interlocutory orders denying government officials qualified immunity when

review of that denial involves a legal question.  See Johnson, 515 U.S. at 311–13

(discussing Mitchell v. Forsyth, 472 U.S. 511 (1985)).  But, after weighing the costs

and benefits of an immediate appeal, the Supreme Court determined that an

immediate appeal from the denial of qualified immunity cannot be justified when the

challenged order "resolved a fact-related dispute about the pretrial record, namely,

whether or not the evidence in the pretrial record was sufficient to show a genuine issue

of fact for trial."  Id. at 307 (emphasis added); see also id. at 313–18.  In reaching that

22

conclusion, the Supreme Court stated that "considerations of delay, comparative expertise

of trial and appellate courts, and wise use of appellate resources argue in favor of limiting

interlocutory appeals of 'qualified immunity' matters to cases presenting more abstract

issues of law." Id. at 317.  That is because "the existence, or nonexistence, of a triable

issue of fact—is the kind of issue that trial judges, not appellate judges, confront almost

daily." Id. at 316.  Further, "questions about whether or not a record demonstrates a

'genuine' issue of fact for trial, if appealable, can consume inordinate amounts of

appellate time," which means "greater delay." Id.  And

> the close connection between this kind of issue and the factual matter that
> will likely surface at trial means that the appellate court, in the many
> instances in which it upholds a district court's decision denying summary
> judgment, may well be faced with approximately the same factual issue
> again, after trial, with just enough change brought about by the trial
> testimony[] to require it, once again, to canvass the record. That is to say, an
> interlocutory appeal concerning this kind of issue in a sense makes unwise
> use of appellate courts' time, by forcing them to decide in the context of a
> less developed record, an issue very similar to one they may well decide
> anyway later, on a record that will permit a better decision.

Id. at 316–17.  The Supreme Court, therefore, denied an immediate appeal from the

category of orders denying summary judgment based on qualified immunity when that

denial was based on the determination that there were genuinely disputed issues of

material fact that remain to be resolved. Id. at 317.  The Court reached that conclusion

even while acknowledging that its decision "forces public officials to trial," "[a]nd, to

that extent, it threatens to undercut the very policy (protecting public officials from

lawsuits) that (the <u>Mitchell</u> Court held) militates in favor of immediate appeals" in the qualified-immunity context.[8]  <u>Id.</u>

One other important point that we keep in mind when considering whether to apply the collateral order doctrine is that our focus is not on whether an immediate appeal should be available in a particular case, but instead we focus on whether an immediate appeal should be available for the <u>category</u> of orders at issue:

> [W]e "decide appealability for categories of orders rather than individual orders." <u>Johnson v. Jones</u>, 515 U.S. 304, 315 (1995). Thus, our task is not to look at the "individual case [and] engage in ad hoc balancing to decide issues of appealability." <u>Id.</u> Instead, we must undertake a more general consideration of "the competing considerations underlying all questions of finality—'the inconvenience and costs of piecemeal review on the one [hand] and the danger of denying justice by delay on the other.'" <u>Id.</u> (citation omitted).

<u>Los Lobos Renewable Power</u>, 885 F.3d at 664.  We must, then, evaluate appealability under the collateral order doctrine without regard to a "particular injustice" that may be "averted" by an immediate appeal in a given case.  <u>Dig. Equip. Corp. v. Desktop Direct, Inc.</u>, 511 U.S. 863, 868 (1994) (quotation marks omitted)); <u>see also</u> <u>Johnson</u>,

---

[8] There are cases in the qualified-immunity context where a court will construe disputed facts in the plaintiff's favor in order to answer the <u>legal</u> question of whether the plaintiff has asserted a clearly established constitutional violation.  Here, on the other hand, the question of whether an employee is a "minister" is largely a factual question.  The district court in this case held that based on the parties' competing evidence, a rational jury could find either that Tucker was or was not a "minister." That is quintessentially a factual determination for the jury.  Furthermore, that factual question at issue here is similar to the qualified-immunity question of fact that the Supreme Court declined to address as a collateral order in <u>Johnson</u>—whether there was sufficient evidence that a jury could find either that certain defendant police officers were, or were not, present when other police officers allegedly beat the plaintiff.  <u>See</u> 515 U.S. at 307, 313.

515 U.S. at 315 ("[W]e do not . . . in each individual case engage in ad hoc balancing to decide issues of appealability.").

For our purposes here, the relevant category is orders preliminarily denying a religious employer summary judgment on the "ministerial exception" defense because there exist genuinely disputed issues of fact that a jury must first resolve. Next, weighing whether the collateral order doctrine should apply to that category of orders, we conclude that these orders do not fall within the small, modest, and narrow class of cases capable of satisfying this stringent collateral-order test.  See Kell, 925 F.3d at 452.[9]

## C.  The Collateral Order Doctrine Applied Here

It is Faith Christian's burden to establish our jurisdiction to consider immediate appeals from this category of orders under the collateral order doctrine. See Los Lobos Renewable Power, 885 F.3d at 664.  As previously stated,

> [t]o come within the "small class" of decisions excepted from the final-judgment rule by Cohen, the order must [1] conclusively determine the disputed question, [2] resolve an important issue completely separate

---

[9] The dissent makes clear that it deems the district court in this particular case to have erred in denying Faith Christian summary judgment on its affirmative "ministerial exception" defense.  The dissent, for example, notes that in this case the district court failed adequately to identify exactly what factual disputes preclude summary judgment.  We disagree.  The district court clearly stated that, based on the parties' competing evidence, which the court laid out in some detail, a reasonable jury could find either that Tucker was, or was not, a minister.  Nonetheless, the dissent's assertion that the district court erred in denying summary judgment in this particular case is the wrong focus for deciding whether the category of orders at issue here, orders denying a religious employer summary judgment on its affirmative "ministerial exception" defense because there remain material factual disputes that a jury must decide, should always be immediately appealable.

from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment.

Coopers & Lybrand, 437 U.S. at 468 (1978) (applying Cohen, 337 U.S. 541).  As explained next, Faith Christian can only meet the first and third Cohen requirements if we treat the "ministerial exception" as immunizing a religious employer, not just from liability, but from having to litigate at all its employee's employment discrimination claims.  Because we decline to afford the "ministerial exception" such expansive treatment, we conclude Faith Christian has not established our jurisdiction under the collateral order doctrine.

**1. Faith Christian has established Cohen's second requirement**

Of these three requirements, Cohen's second requirement is clearly satisfied here.  There is no doubt that this category of orders—decisions denying a religious employer summary judgment on the "ministerial exception"—presents an important First Amendment issue, and that issue is separate from the merits of an employee's discrimination claims.

**2. Faith Christian has not established Cohen's third requirement[10]**

**a.  Faith Christian has failed to establish that this category of orders denying summary judgment will be effectively unreviewable on appeal from final judgment**

---

[10] We address Cohen's third requirement before we address Cohen's first requirement because our analysis on the first requirement rests on some of the same analysis pertaining to Cohen's third requirement, and it seems to be the more efficient way to address Faith Christian's failure to satisfy either of these requirements.

26

We conclude that this category of orders, like most orders denying summary judgment, see Ralston v. Cannon, 884 F.3d 1060, 1066 (10th Cir. 2018), can be effectively reviewed in the usual course of litigation; that is, we can effectively review such an order on appeal after the conclusion of litigation in the district court, see Dig. Equip., 511 U.S. at 868.  In arguing to the contrary, Faith Christian asserts that the "ministerial exception" protects religious employers not just from liability based on its minister's employment discrimination claims, but also from the burden of litigating such claims, and it is this protection against the burdens of litigation that will be lost without an immediate appeal.  We reject that argument because Faith Christian is incorrect that the "ministerial exception" immunizes a religious employer from suit on employment discrimination claims.

As we have already indicated, the Supreme Court deems the "ministerial exception" to be, "not a jurisdictional bar," but instead to "operate[] as an affirmative defense to an otherwise cognizable claim . . . because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'"  Hosanna-Tabor, 565 U.S. at 195 n.4 (quoting Morrison, 561 U.S. at 254) (emphasis added).  Hosanna-Tabor, in recognizing the "ministerial exception," further stated that "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, . . . interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs."  Id. at 188.  That language indicates that the "ministerial exception" protects religious employers from liability,

27

but nothing there suggests a further protection from the burdens of litigation itself. See Peter J. Smith & Robert W. Tuttle, "Civil Procedure and the Ministerial Exception," 86 Fordham L. Rev. 1847, 1881-82 (2018) (noting that, when "disputed questions of fact concerning the plaintiff's status as a minister cannot be resolved at the summary judgment stage, . . . the matter proceeds to trial."). Generally, any error a district court makes in failing to apply an affirmative defense foreclosing liability can be reviewed and corrected after final judgment has been entered in the case. See id. at 1881 (noting "fundamental value of the ministerial exception would not be entirely lost by waiting for a final judgment before permitting an appeal").[11] [12]

---

[11] Hosanna-Tabor indicated that "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, . . . interferes with the internal governance of the church." 565 U.S. at 188. But requiring a religious employer to incur litigation costs to defend against claims asserted against it by an employee under a generally applicable employment discrimination statute does not punish a religious employer. It is, instead, the cost of living and doing business in a civilized and highly regulated society. See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 173, 202, 204–05 (1985) (Stevens, J., concurring) (addressing citizen's litigation costs incurred to challenge local government's zoning decisions), overruled in part on other grounds by Knick v. Twp. of Scott, 139 S. Ct. 2162, 2167–68 (2019); HMK Corp. v. Cty. of Chesterfield, 616 F. Supp. 667, 670–71 (E.D. Va. 1985). It bears repeating that religious institutions do not "enjoy a general immunity from secular laws." Our Lady, 140 S. Ct. at 2060.

[12] Faith Christian argues that it might hypothetically be required to keep an unwanted minister during the pendency of this trial if it cannot raise a challenge to the district court order interlocutorily. But, of course, that issue is not present in this case because Faith Christian fired plaintiff summarily within days of hearing from disgruntled parents.

Further, Faith Christian has not presented evidence that this concern will typically be presented in other similar litigation scenarios. To the contrary, self-help would seem to be the norm for almost all such other situations.

The "ministerial exception" shares the same characteristics as numerous other defenses to liability that a church might assert in other kinds of litigation. "[V]irtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring a 'right not to stand trial.'" Dig. Equip., 511 U.S. at 873.  That includes orders denying summary judgment. See id.  But allowing an immediate appeal from the denial of a dismissal based on all of these rules would eviscerate the congressionally mandated final judgment rule. See id.; Wright & Miller, 15A Federal Practice & Procedure § 3911.4.

Thus, even though other situations could just as convincingly be characterized as involving rules protecting against the burdens of going to trial, courts have almost always denied immediate appeals under the collateral order doctrine from the following: orders denying dismissal based on lack of subject matter jurisdiction, lack of personal jurisdiction, immunity from service of process, preclusion principles, an agency's primary jurisdiction, forum non conveniens, speedy trial rights (in a criminal case), almost all denials of summary judgment, and the district court's

---

Faith Christian responds that it might ultimately have to respond in damages to improper discharge, but of course that would be a consequence only after trial if the plaintiff is found not to have been a minister and that the discharge was improper under Title VII.  If that situation prevails, of course, the church is simply being held properly to the same standards as all other institutions and employers in America. There is no allegation or evidence that alternatives to an interlocutory collateral-order appeal now would be onerous to Faith Christian or, indeed, to most churches in America.  Expedited litigation procedures such as the bifurcated procedures used here will often be adequate to address the concerns that Faith Christian raises.

29

refusal to remand a civil case to state court, to name just a few.  See Dig. Equip., 511

U.S. at 873; Wright & Miller, 15A Federal Practice & Procedure §§ 3911.3, 3911.4.

This litany of analogous situations underscores that courts have jealously

protected the narrow scope of the collateral order doctrine and for good reason:

> The general lesson of these illustrations and still others is simple. The mere burden of submitting to trial proceedings that will be wasted if the appellant's position is correct does not support collateral order appeal. Nor is it enough to show that a wrong order may cause tactical disadvantages that cannot be undone even by a second trial.  The final judgment rule rests on a determination that ordinarily these costs must be borne to support the greater benefits that generally flow from denying interlocutory appeal.

Wright & Miller, 15A Federal Practice & Procedure § 3911.4 (footnotes omitted).

Those benefits include, among others, avoiding the delays and disruptions to

litigation caused by piecemeal appeals and preventing unnecessary and repetitive

appellate review.  See Johnson, 515 U.S. at 309.

### b. Faith Christian's analogy to qualified immunity is inaccurate

Faith Christian counters that the "ministerial exception" is no ordinary

affirmative defense; it is one rooted in the First Amendment and, therefore, the denial

of summary judgment on that defense warrants an immediate appeal.  In support of

that assertion, Faith Christian tries to draw an analogy between the category of orders

at issue here—orders denying summary judgment to a religious employer on the

"ministerial exception" because there remain factual disputes that a fact-finder must

resolve—and a non-church based category of orders for which courts do allow

interlocutory appeals—when the district court denies a government official qualified

immunity based on abstract questions of law.  But that analogy is not helpful to Faith

Christian because these two affirmative defenses—the "ministerial exception" and

qualified immunity—are simply not at all similar.

Unlike the "ministerial exception," the Supreme Court has explicitly

recognized that qualified immunity protects government officials not only from

liability, but also from the burdens of litigation itself.  See Mitchell, 472 U.S. at 525–

27.  Because qualified immunity is predicated on "an immunity from suit rather than

a mere defense to liability . . . , it is effectively lost if a case is erroneously permitted

to go to trial."  Id. at 526.  But Faith Christian has not cited any case holding that the

"ministerial exception" similarly immunizes a private religious employer from the

burdens of litigating employment discrimination claims brought against it by one of

its ministers.[13]

In an analogous situation, the Seventh Circuit refused to permit an immediate

appeal under the collateral order doctrine from an order denying a religious employer

summary judgment on Title VII's statutory exemptions and its general First

Amendment defense.  Cf. Herx v. Diocese of Ft. Wayne-S. Bend, Inc., 772 F.3d

1085, 1088, 1090 (7th Cir. 2014).  Herx reasoned that, "although the statutory and

constitutional rights asserted in defense of this suit are undoubtedly important, the

Diocese [the religious employer] has not established that the Title VII exemptions or

---

[13]  To the contrary, see Smith & Tuttle, 86 Fordham L. Rev. at 1881 (stating that "the ministerial exception, at bottom, is still a defense to liability rather than a comprehensive immunity from suit" and any error that the district court makes in not applying that exception can be reviewed effectively on appeal from final judgment).

the First Amendment more generally provides an immunity from trial, as opposed to an ordinary defense to liability." Id. at 1090. Although Herx did not involve the "ministerial exception," id. at 1091 n.1, it does support both our conclusions that the "ministerial exception" does not immunize a religious employer from litigating Title VII claims asserted against it by a minister and that orders denying summary judgment on the "ministerial exception" are not immediately appealable.

Faith Christian's policy arguments for extending qualified immunity to private religious employers are also not persuasive. To be sure, this Court has previously noted some similarities between a religious employer's First Amendment defenses and "a government official's defense of qualified immunity." Bryce, 289 F.3d at 654 (addressing church autonomy doctrine); see also Skrzypczak, 611 F.3d at 1242 (addressing "ministerial exception"). But in doing so, we were quick to note further that, "[o]f course, the doctrines and their inquiries are quite different, as are the reasons for addressing them early in the litigation process." Bryce, 289 F.3d at 654 n.1. Qualified immunity applies to suits against government officials in an effort to protect the public's interest in a functioning government. See id. To that end, qualified immunity seeks to avoid "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." Mitchell, 472 U.S. at 526 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 816 (1982)).[14]

---

[14] For similar reasons, courts have recognized the need for immediate appeals under the collateral order doctrine from categories of orders denying a government

32

Courts, however, "hesita[te] to extend immunity from suit to a private party without a statutory basis" to do so because "[i]mmunity from suit is a benefit typically only reserved for governmental officials." Gen. Steel Domestic Sales, L.L.C. v. Chumley, 840 F.3d 1178, 1182 (10th Cir. 2016). The Supreme Court has similarly stated that rationales underlying qualified immunity—"to safeguard government, and thereby to protect the public at large"—"are not transferable to private parties." Wyatt, 504 U.S. at 168. The fact that the "ministerial exception" applies only to private religious organizations, then, counsels against treating the "ministerial exception" like an immunity from suit, under both Supreme Court and Tenth Circuit precedent.

---

official's claim to absolute immunity. See Mitchell, 472 U.S. at 525 (citing Nixon v. Fitzgerald, 457 U.S. 731 (1982)). In recognizing both qualified and absolute immunity, the Supreme Court has "consistently held that government officials are entitled to some form of immunity from suits for damages" in order to protect "public officers . . . from undue interference with their duties and from potentially disabling threats of liability." Harlow, 457 U.S. at 806. Absolute immunity applies to "officials whose special functions or constitutional status requires complete protection from suit," like legislators acting in their legislative capacity, judges acting in their judicial capacity, and prosecutors and executive officers engaged in adjudicative functions, as well as the President of the United States. Id. "For executive officials in general, however, . . . qualified immunity represents the norm," in an effort "to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" Id. (quoting Butz v. Economou, 438 U.S. 478, 506 (1978)). Courts also recognize immediate appeals under the collateral order doctrine from categories of orders denying a government's claim to Eleventh Amendment immunity, see P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 141 (1993), as well as a foreign government's claim to immunity, see Herx, 772 F.3d at 1090 (7th Cir.).

33

The dissent incorrectly suggests that we are concerned about applying the collateral order doctrine generally in civil cases between private parties. Not so. As the cases cited by the dissent illustrate, immediately appealable collateral orders can arise in the course of private civil litigation.[15] Our specific concern is instead with the dissent's unprecedented extension of immunity to private religious organizations in order to protect them from the burdens of even litigating claims brought against them by employees alleging illegal employment discrimination. Since the dissent fails to establish the necessary predicate that the "ministerial exception" protects churches from even litigating a Title VII claim, it has no other basis to seek to apply the Cohen collateral order doctrine.

Treating the "ministerial exception" as protecting religious employers from the burdens of litigation based on the First Amendment does not make sense in the bigger picture of religious organizations and the legal system. Although religious institutions enjoy some protections under the "ministerial exception," religious institutions do not "enjoy a general immunity from secular laws." Our Lady, 140 S. Ct. at 2060; see also Ohio C.R. Comm'n v. Dayton Christian Schs., Inc., 477 U.S. 619, 628 (1986) ("Even religious schools cannot claim to be wholly free from some

---

[15] Los Lobos Renewable Power, LLC v. AmeriCulture, Inc., 885 F.3d 659 (10th Cir. 2018), is one such example. But that case otherwise has no relevance to the issues before us. It dealt with the application of a unique New Mexico statute providing expedited procedures in a narrow class of litigation described as "strategic lawsuits against public participation," or "SLAPP." Id. at 662. Here, of course, there is no SLAPP claim and obviously no need to apply the New Mexico law.

state regulation."). Religious entities can be sued on myriad theories. See

Skrzypczak, 611 F.3d at 1244–46 (discussing lawsuits that can and cannot be brought

against religious organizations); Tomic v. Catholic Diocese, 442 F.3d 1036, 1039–40

(7th Cir. 2006) (same), overruled on other grounds by Hosanna-Tabor, 565 U.S. at

195 n.4 (holding "ministerial exception" is not jurisdictional).

As just one example, religious employers can be sued by their non-ministerial

employees for violating anti-discrimination employment statutes. See, e.g., Rayburn,

772 F.2d at 1169. That highlights the importance of the merits question at issue in

this appeal. If the employee is a minister, suit over the employment discrimination

claims ends. But if the employee is not a minister, then those claims must be

resolved according to our normal jurisprudential process.

In summary, Faith Christian has failed to cite any case specifically treating the

"ministerial exception" as protecting a religious employer from litigation itself. Such

a position is contrary to our legal system's treatment of religious entities generally—

they are protected by the First Amendment, certainly, but are generally not excused

from complying with generally applicable government regulation or from being haled

into court.

### c. The grounds Faith Christian asserts for extending qualified immunity to a private religious employer are not persuasive

Faith Christian's argument for an immediate appeal is premised on treating the

"ministerial exception" like qualified immunity. The dissent adopts that argument.

Both advance two justifications for extending qualified immunity from suit to private

religious employers—Hosanna-Tabor treated the "ministerial exception" as an immunity from suit and the "ministerial exception" is a structural limitation on the court's authority to act. Neither justification is a correct statement of the law.

### i. Hosanna-Tabor did not treat the "ministerial exception" as immunizing a private religious employer from suit

Faith Christian contends that the Supreme Court, in first recognizing the "ministerial exception" in Hosanna-Tabor, treated the "ministerial exception" as immunizing religious employers, not just from liability, but from suit itself. Hosanna-Tabor, however, never addressed the "ministerial exception" in terms of an immunity of any kind. Instead, it treated the "ministerial exception" as an affirmative defense and never once referred to it as an immunity from suit.[16] Hosanna-Tabor's reasoning suggests only that the "ministerial exception" protects religious employers from liability under Title VII for employment discrimination claims asserted against the religious employer by its ministers. Tellingly, Hosanna-Tabor held that the "ministerial exception" is "not a jurisdictional bar," but instead "operates as an affirmative defense to an otherwise cognizable claim . . . because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'" 565 U.S. at 195 n.4 (quoting Morrison, 561 U.S. at 254) (emphasis added).

---

[16] Similarly, immunity is never mentioned or suggested by the Supreme Court in its later, closely related case of Our Lady.

36

Hosanna-Tabor stated that it would interfere with a church's "internal governance" to require the "church to accept or retain an unwanted minister, or punish[] a church for failing to do so." Id. at 188. That reasoning, of course, does not preclude the need for a fact-finder first to determine whether the plaintiff is or is not in fact a minister. Hosanna-Tabor also held that to grant the relief the employee-minister sought in that case—reinstatement and damages—would violate the First Amendment, and it concluded that, because the employee in that case was a minister, "the First Amendment requires dismissal." Id. at 194. All of that language from Hosanna-Tabor suggests that the "ministerial exception" is a defense that protects a religious employer from ultimate liability under Title VII from a plaintiff who is found to be a minister but not from the normal judicial process to make that predicate determination of whether the plaintiff-employee is in fact a minister.[17]

In arguing to the contrary, Faith Christian and the dissent rely on Hosanna-Tabor's use of the word "bar" several times—i.e., stating that the ministerial exception "bars . . . suit" over a religious employer's decision to fire the plaintiff, id. at 196. According to Faith Christian, the use of the word "bar," without more, "establishes" that the "ministerial exception" immunizes a private religious

---

[17] As noted previously, nothing in this litigation requires Faith Christian to employ an unwanted minister. It has the power, and has already exercised that power, to discharge Tucker. The only issue in this case is damages. If at trial Faith Christian shows that the discharge was protected under the "ministerial exception" or if it is otherwise defensible, Faith Christian would not have to respond in damages for its decision.

employer from suit under Title VII.  However, it would be odd indeed and contrary to the clear language and reasoning in Hosanna-Tabor if Hosanna-Tabor reached the unprecedented result advanced by Faith Christian, extending immunity from suit to private religious employers without expressly addressing and explaining its decision to do so.  It would be odder still for the Court to do so simply by using such a generally applicable term as "bar."  This is especially true in Hosanna-Tabor, where the Court expressly stated  that the "ministerial exception" is "not a jurisdictional bar," but instead "operate[s] as an affirmative defense to an otherwise cognizable claim . . . because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'"  565 U.S. at 195 n.4 (quoting Morrison, 561 U.S. at 254) (emphasis added).[18]

The Supreme Court uses the term "bar" in many different contexts.  As just one example which unmistakably contradicts the dissent's reliance on the word "bar" in this case, the Supreme Court in Digital Equipment distinguished orders holding "that an action is barred on claim preclusion principles" from orders involving an "entitlement to 'avoid suit altogether,'" like qualified immunity.  511 U.S. at 873–75 (emphasis added) (quoting Lauro Lines s.r.l. v. Chasser, 490 U.S. 495, 501 (1989), and citing Mitchell, 472 U.S. 511).[19]

---

[18] The Supreme Court has more generally warned courts to be cautious when using the label "jurisdictional."  See Kontrick v. Ryan, 540 U.S. 443, 454–55 (2004).

[19] Hosanna-Tabor simply did not address whether any church defense immunizes a religious employer from litigation on a minister's employment discrimination claims.  A fair reading of that case as a whole does not suggest any conscious attempt by the

The dissent's contention, that Hosanna-Tabor's use of the word "bar" all by itself implicitly extended qualified immunity from suit to private religious employers is unpersuasive.[20]

### ii. Faith Christian has not established that the "ministerial exception" is a "structural" limitation on a court's authority sufficient to immunize private religious employers from suit under Title VII

Reiterating, Hosanna-Tabor held that the "ministerial exception" is "not a jurisdictional bar" and does not implicate a court's "'power to hear [the] case.'"  565 U.S. at 195 n.4 (quoting Morrison, 561 U.S. at 254).  Faith Christian nevertheless attempts an end-run around this clear Supreme Court language, trying to make the same argument we have just rejected by dressing it up in different clothes—e.g., trying to advance the same argument this time under the rubric of a structural

---

Supreme Court to give the word "bar" the weight the dissent would give it.  Neither the dissent nor the parties have cited any case giving Hosanna-Tabor's use of the term "bar" the expansive and novel reading suggested by Faith Christian and the dissent.  Nor have we found any such case.  The dissent points to the Sixth Circuit's Conlon decision.  But Conlon did not address immunity.  Instead, it relied on Hosanna-Tabor to hold that a religious employer cannot waive the application of the "ministerial exception" defense once it has been determined that the plaintiff-employee qualifies as a minister.  777 F.3d at 833–36.  Neither the Supreme Court nor this Court has addressed that waiver question.  But waiver, in any event, is not the same as an immunity from suit that Faith Christian seeks here.

[20] The dissent also relies on this court's use of the term "adjudication" in Bryce, a pre-Hosanna Tabor Tenth Circuit case, 289 F.3d at 656.  While Bryce discussed the "ministerial exception," its ruling was based only on the church autonomy doctrine.  See id. at 651, 658 n.2.

limitation on courts' authority to rule on an employment discrimination claim.  Faith

Christian's argument is still not persuasive.

### *a.* The three out-of-circuit cases on which Faith Christian relies are inapposite

Faith Christian cites three cases from other circuits in support of its

structural-limitations argument—Conlon, 777 F.3d 829 (6th Cir.); Lee, 903 F.3d 113

(3d Cir.); and Tomic, 442 F.3d 1036 (7th Cir.).  None of these three cases are binding

on us.  But, in any event, each of them is distinguishable.  None of the three address

the question of whether the "ministerial exception" immunizes a religious employer

from litigating employment discrimination claims.  Instead, each of those cases

addressed only the question of whether a religious employer could waive (or forfeit)

a "ministerial exception" defense.  Further, each of the three cases addressed the

waiver question only after it was clear that the plaintiff-employee was a minister.

That, too, differs from this case.  Of greater concern, the specific language from

those cases on which Faith Christian relies contradicts Hosanna-Tabor's express

language indicating that the "ministerial exception" does not implicate a court's

power to hear an employment discrimination claim.

In Conlon, for example, the Sixth Circuit expressly stated that, before deciding

whether a religious employer could "waive[]" its "ministerial exception" defense, the

court first had to "consider whether the ministerial exception would otherwise apply

to the[] facts" plaintiff alleged.  777 F.3d at 833.  The Sixth Circuit then determined

that the plaintiff-employee in that case was a minister and, thus, that the employer

40

could assert the "ministerial exception." Id. at 832, 834–35. Only after that did Conlon cite the First Amendment and state the generally accepted principle that the "government cannot dictate to a religious organization who its spiritual leaders will be." Id. at 835–36. On that basis, Conlon rejected the plaintiff-employee's assertion that the employer had "waived" its "ministerial exception" defense, ruling that the "ministerial exception" cannot be waived." Id. at 836.

In Lee, a Third Circuit case, there was no dispute that the plaintiff-employee, the pastor of a Baptist church, qualified as a minister. Lee sued the church, alleging the church had breached its employment contract with Lee. 903 F.3d at 116–18. Lee moved for summary judgment and, in its defense, the Church responded by asserting several defenses, but not the "ministerial exception." Id. at 118 & n.2. It was the district court which, sua sponte, raised the "ministerial exception" and eventually granted the non-moving Church summary judgment on that basis. Id. at 118. The Third Circuit ruled that the employer had not "waived" the affirmative "ministerial exception" defense because it "is rooted in constitutional limits on judicial authority." Id. at 118 n.4. Alternatively, the court noted that Lee did not argue waiver to the district court. Id.

In Tomic, a pre-Hosanna-Tabor case, the Seventh Circuit treated the "ministerial exception" as a jurisdictional limitation, see 442 F.3d at 1039, a proposition which the Supreme Court later rejected in Hosanna-Tabor, see 565 U.S. at 195 n.4. In a general discussion, Tomic noted "that federal courts cannot always avoid taking a stand on a religious question." 442 F.3d at 1039. Where, for example,

41

a church designated all of its employees, including the janitor, as a minister, a "court would have to determine whether under the actual law of the church in question . . . janitors really were ministers." Id. But under the specific facts that the plaintiff-employee alleged in Tomic, the Seventh Circuit held that the plaintiff-employee, as the music director for a Catholic diocese, qualified as a minister. Id. at 1040–41. After reaching that conclusion, the Seventh Circuit considered "whether it makes a difference that the diocese represents itself as an 'equal opportunity' employer." Id. at 1041. The court held it did not make a difference because "the ministerial exception, like the rest of the internal-affairs doctrine, is not subject to waiver or estoppel." Id. at 1042.

　　None of these three out-of-circuit cases binds this Court. Furthermore, and of most concern, the language from each of these cases on which Faith Christian relies—language referring to the "ministerial exception" as a "structural" or a constitutional "limitation" on a court's "authority"—contradicts Hosanna-Tabor's language explicitly stating that the "ministerial exception" is not jurisdictional and does not implicate the question of "whether the court has 'power to hear [the] case.'" 565 U.S. at 195 n.4 (quoting Morrison, 561 U.S. at 254). Moreover, although the post-Hosanna-Tabor cases of Conlon and Lee recognized that Hosanna-Tabor held that the "ministerial exception" is not jurisdictional, neither Conlon nor Lee acknowledged and addressed the Supreme Court's further language indicating that the "ministerial exception" does not implicate a court's "'power to hear [the] case,'"

42

id. (quoting Morrison, 561 F.3d at 254).  (Neither Faith Christian nor the dissent address this language from Hosanna-Tabor, either.)

Beyond that significant problem, none of these three cases address the question presented here, which is whether the category of orders denying a religious employer summary judgment on its "ministerial exception" defense should be immediately appealable.  Nor do any of these three cases address whether the "ministerial exception" immunizes a religious employer from ever having to litigate its minister's employment discrimination claims.  Instead, the three cases cited by Faith Christian address only whether an employer can "waive" (or forfeit) its affirmative "ministerial exception" defense, once it has been determined that the plaintiff-employee is a minister.  That waiver question, which neither the Supreme Court nor this Court has addressed, is not analogous to the immunity from suit Faith Christian seeks here.  For myriad reasons, then, these three cases on which Faith Christian relies are not helpful.

### b.  The Establishment Clause requires that courts avoid only excessive entanglement

Faith Christian relies on the Establishment Clause's admonition that courts avoid excessive entanglement with religion to argue that the "ministerial exception" is a "structural" limitation on a court's authority to adjudicate an employment discrimination claim.  But "[e]ntanglement must be 'excessive' before it runs afoul of the Establishment Clause."  Agostini v. Felton, 521 U.S. 203, 233 (1997).

43

A district court's decision to deny a religious employer summary judgment because there are disputed issues of fact material to whether or not the plaintiff-employee is a minister does not represent excessive entanglement. See generally id. (noting "[i]nteraction between church and state is inevitable"). Instead, the fact finder must determine whether the plaintiff-employee is a minister before deciding whether the "ministerial exception" applies in a given case. If the plaintiff-employee is not a minister, there is no entanglement with religion and the "ministerial exception" does not apply. Religious institutions do not "enjoy a general immunity from secular laws." Our Lady, 140 S. Ct. at 2060. Instead, applying neutral and generally applicable laws to religious institutions ordinarily does not violate the First Amendment. See Fulton v. City of Philadelphia, 141 S. Ct. 1868, 1876–77 (2021) (citing cases). Faith Christian, thus, is subject to Title VII discrimination claims brought against it by a non-ministerial employee. See Rayburn, 772 F.3d at 1169 (4th Cir.). Requiring Faith Christian to litigate to resolution here the genuinely disputed predicate factual issue of whether or not Tucker is a minister does not amount to an excessive entanglement of courts with religion. It is instead a necessary factual determination that will resolve whether the "ministerial exception" even applies in the first place. And, where there is a genuinely disputed factual issue as to whether an employee qualifies as a "minister," a jury must resolve that predicate material factual dispute. That cannot be avoided in light of the fact-intensive nature of the question, as emphasized by the Supreme

44

Court in both <u>Our Lady</u>, 140 S. Ct. at 2066–67, and <u>Hosanna-Tabor</u>, 565 U.S. at 190–94.

Faith Christian disagrees, asserting that allowing this case to proceed to merits discovery and possibly a trial will require the district court's <u>excessive</u> entanglement with religion. But determining the narrow binary factual question of whether a particular plaintiff is or is not a minister of the defendant church is not excessive entanglement. If the determination is that the plaintiff is not a minister, requiring the church to stand trial on an employment discrimination claim, or indeed other secular claims, is not excessive entanglement or even entanglement at all. If Faith Christian were entitled to immunity here it would be "immunity by ipse dixit"—immunity because Faith Christian simply declared Tucker (and indeed nearly all of its employees) to be ministers.

If this case goes to trial, it does not reasonably mean that even a jury will ever be required to resolve any religious dispute. Instead, the district court could instruct the jury to decide first whether Tucker is a minister (without regard to whether he is a faithful or feckless minister); if Tucker is determined to be a minister, the jury's inquiry ends. Only if the jury finds that Faith Christian failed to prove that Tucker is a minister can the jury then decide the secular merits of Tucker's Title VII (and Colorado law) claims.

To hold otherwise would place a religious employer above the law, and that is not the purpose of the "ministerial exception."

45

***c.* Faith Christian has not cited any case where an interlocutory ruling denying dismissal of a claim against a party based on the Establishment Clause was immediately appealable**

Faith Christian has not cited, nor have we found, any case permitting an immediate collateral-order appeal challenging a court's decision to decline to dismiss secular claims based on the Establishment Clause's prohibition against courts' <u>excessive</u> entanglement with religion.

Faith Christian mentions <u>Whole Women's Health v. Smith</u>, 896 F.3d 362 (5th Cir. 2018), but the circumstances at issue there were very different from this case. In <u>Smith</u>, the district court issued a discovery order requiring the Texas Conference of Catholic Bishops ("Conference"), which was not a party to the litigation, to produce its "internal communications." <u>Id.</u> at 364. The Fifth Circuit permitted an immediate appeal from that decision under the collateral order doctrine because the contested discovery order conclusively determined that the non-party Conference had to turn over its internal communications and, because the discovery order was directed to a non-party, it was effectively unreviewable following a final judgment entered in the parties' litigation. <u>Id.</u> at 367–69. That is a very different situation than the one presented here, where a party-defendant (Faith Christian) seeks an immediate collateral-order appeal from the denial of summary judgment on its affirmative defense because there remain material factual disputes that a jury must decide. Here, Faith Christian can challenge that finding after final judgment if an adverse judgment is ultimately rendered against it.

46

### *d.* Conclusion as to Faith Christian's structural argument

Bringing this discussion full circle, <u>Hosanna-Tabor</u> expressly held that the "ministerial exception" is not jurisdictional. <u>See</u> 565 U.S. at 195 n.4. But even if, directly contrary to <u>Hosanna-Tabor</u>'s clear language, we treated the "ministerial exception" as jurisdictional, that would not entitle Faith Christian to an immediate appeal. Even decisions denying dismissal based on the lack of subject matter or personal jurisdiction are generally not immediately appealable. <u>See</u> 15A Wright & Miller §§ 3911.3, 3911.4.

Furthermore, even if, again contrary to <u>Hosanna-Tabor</u>'s express language, we instead relied on the Establishment Clause to treat the "ministerial exception" as a limitation on a court's authority to adjudicate an employee's discrimination claim, Faith Christian would still not be entitled to an immediate appeal. Any limitation the "ministerial exception" imposes is only conditional and would not be triggered unless and until the religious employer established as a matter of fact that the employee qualified as a minister. The Establishment Clause's admonition that courts avoid excessive entanglement with religion would have no application if the employee was found not to be a minister. And, as already explained, and as emphasized by the Supreme Court in <u>Hosanna-Tabor</u> and <u>Our Lady</u>, because the determination of whether or not an employee is a minister involves a fact-intensive inquiry, the denial of summary judgment on that issue because there are material factual disputes does not justify an immediate appeal under the collateral order doctrine.

Many of the arguments made by Faith Christian, the dissent and a number of amici to the contrary simply presuppose that the plaintiff-employee will always be a minister. Those arguments are not realistic. They ignore the possibility, presented here, that a district court will conclude that summary judgment cannot be entered for the religious employer because there are genuinely disputed material facts that a jury must resolve. If a jury's resolution of those facts indicates that the employee is not a minister, then the Establishment Clause is not implicated.

### c.  Conclusion as to <u>Cohen</u>'s third requirement

We conclude that the "ministerial exception" is not analogous to qualified immunity and does not immunize religious employers from the burdens of litigation itself. While the "ministerial exception" does protect a religious employer from <u>liability</u> on claims asserted by a "<u>minister</u>" who alleges that the employer violated anti-discrimination employment laws, any error the district court makes in failing to apply that affirmative defense can be effectively reviewed and corrected through an appeal after final judgment is entered in the case.

### 3.  Faith Christian also cannot meet <u>Cohen</u>'s first requirement, that the category of orders being appealed conclusively determine the disputed question

Because we conclude that Faith Christian has failed to establish that this category of orders satisfies the third <u>Cohen</u> prong, we need not address whether Faith Christian satisfied <u>Cohen</u>'s first prong—that the category of orders being appealed conclusively determine the disputed question, whether an employee qualifies as a minister. See <u>Coopers & Lybrand</u>, 437 U.S. at 468 (applying <u>Cohen</u>, 337 U.S. 541).

But Faith Christian cannot satisfy <u>Cohen</u>'s first requirement either.  It is clear that the district court denied summary judgment because a jury must resolve the genuinely disputed fact question of whether Tucker was a "minister"; that ruling unquestionably did not "<u>conclusively</u> <u>determine</u> the disputed question" of Tucker's ministerial status, <u>Coopers & Lybrand</u>, 437 U.S. at 468 (emphasis added).  Instead, the district court's decision clearly contemplates further factual proceedings to resolve that disputed issue of fact of Tucker's ministerial status <u>vel</u> <u>non</u>.

As with the third <u>Cohen</u> requirement, again the dissent can only conclude that the first <u>Cohen</u> requirement is satisfied if the "ministerial exception" immunizes religious employers even from suit under Title VII.  But, as explained in our discussion of the third <u>Cohen</u> requirement, this is an incorrect characterization of the "ministerial exception.[21]

---

[21] Because Faith Christian has failed to meet either <u>Cohen</u>'s first or third requirements for immediate appeal under the collateral order doctrine, we have no interlocutory jurisdiction to address the merits of the district court's decision to deny Faith Christian summary judgment on its "ministerial exception" defense.  The dissent addresses the merits of that question and concludes the district court erred; that is, the dissent concludes that the factual question of whether Tucker was a "minister" should be taken from a jury and decided in the first instance by this court.  We have two concerns about the dissent's merits discussion.  First, the dissent contends that the district court failed to identify specific factual disputes that preclude summary judgment.  But that is not so.  The district court laid out in extensive detail each side's evidence on the question of whether Tucker was a minister (Aplt. App. 274–82) and then held that "whether Mr. Tucker was a 'minister' within the meaning of the 'ministerial exception' is genuinely disputed on the evidence presented" and that a reasonable jury considering that competing evidence could find either that Tucker was, or was not, a minister (<u>id.</u> at 284).

Second, the dissent asserts that it views that competing evidence in the light most favorable to Tucker, but then relies on Faith Christian's evidence.  As the

### III. CONCLUSION

The Supreme Court could of course extend the scope of the collateral order doctrine to allow interlocutory appeals of cases like the one before us. But until and unless that occurs, our task is to apply current existing law, which we have tried faithfully to do. Only a very small number of orders qualify categorically as immediately appealable under the collateral order doctrine. Faith Christian has not shown that the category of orders at issue here—decisions denying a religious employer summary judgment on the employer's "ministerial exception" defense because of a genuine dispute of material issues of fact—cannot be effectively reviewed at the conclusion of the litigation. We, therefore, do not have jurisdiction under the collateral order doctrine to consider this appeal and, accordingly, DISMISS it for lack of jurisdiction.

---

district court explained the evidence, Faith Christian's evidence was primarily self-serving documents describing Tucker's position, like an extension agreement and teacher handbook, while Tucker's evidence addressed the actual "facts and circumstances of his employment." (Aplt. App. 284.) The district court noted that, if a jury believed Tucker's evidence, the jury "could rationally" find that he was not a "minister." Id. Furthermore, Faith Christian's documents on which the dissent relies appear to classify all teachers and indeed all staff members as "ministers." Such an indiscriminate blanket statement giving ministerial status to essentially its entire staff is contrary to the case-specific inquiry as to whether a given employee should be deemed a "minister" for purposes of the "ministerial exception." See Fratello, 863 F.3d at 207 (2d Cir.) (noting that religious employer "cannot insulate itself from . . . liability by bestowing hollow ministerial titles upon many or all of its employees"); see also Tomic, 442 F.3d at 1039 (7th Cir.). We lack jurisdiction to consider the merits of the district court's decision and so we do not address those merits in detail. But there are concerns about the dissent's discussion of those merits.

*Gregory Tucker v. Faith Bible Chapel,* No. 20-1230
**BACHARACH**, J., dissenting

This case involves an employment dispute and the ministerial exception. This exception stems from the Religion Clauses of the First Amendment and bars courts from considering employment disputes between religious bodies and their ministers. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). By barring consideration of these disputes, the ministerial exception protects the free exercise of religion and prevents judicial entanglement in religious matters. *Hosanna-Tabor*, 565 U.S. at 188.

The defendant (Faith Bible Chapel) sought summary judgment[1] based on the ministerial exception, arguing that the plaintiff (Mr. Gregory Tucker) had been employed as a minister. But the district court denied summary judgment and reconsideration.[2] Faith Bible appeals, arguing that

- appellate jurisdiction exists under the collateral-order doctrine and

---

[1]     Faith Bible moved to dismiss, and the district court converted the motion to one for summary judgment.

[2]     The district court granted Faith Bible's motion for summary judgment on a claim under Title VI, but that claim does not bear on this appeal.

- the ministerial exception bars relief.[3]

The majority concludes that we lack jurisdiction, but I respectfully disagree. In my view, we have appellate jurisdiction under the collateral-order doctrine. With jurisdiction, we should reverse because the undisputed evidence shows that Mr. Tucker was acting as a minister when his employment ended. So I respectfully dissent.

## I.    After his employment ended, Mr. Tucker sued.

Mr. Tucker worked as a teacher and as a Director of Student Life/Chaplain at a religious school, Faith Christian Academy. But parents of the students bristled when Mr. Tucker led a program on race and faith, and school officials later stripped Mr. Tucker of his position as a Director of Student Life/Chaplain. About a month later, school officials also terminated his employment as a teacher.

The termination led to a suit against the school's operator, Faith Bible, under Title VII and Colorado law for retaliating against Mr. Tucker's anti-racist statements. In response, Faith Bible attributes the termination to a disagreement about Mr. Tucker's interpretation of scriptural passages.

---

[3]    Faith Bible also asserts a church-autonomy defense, which the majority treats as underdeveloped. I express no opinion on the development of that defense.

2

The substantive issue on appeal is whether a genuine dispute of material fact existed regarding Mr. Tucker's status as a minister.

## II.     We should consider all of Mr. Tucker's jurisdictional challenges.

Faith Bible argues that Mr. Tucker conceded multiple jurisdictional arguments by failing to respond to them when he briefed jurisdiction. But parties cannot waive challenges to appellate jurisdiction. *Tuck v. United Servs. Auto. Ass'n*, 859 F.2d 842, 844 (10th Cir. 1988). So we should consider all of Mr. Tucker's jurisdictional challenges.

## III.    The ministerial exception involves a defense against suit, not just against liability.

Consideration of these jurisdictional challenges turns on the nature of the ministerial exception. Mr. Tucker considers this exception like any ordinary affirmative defense, serving only the personal interests of private individuals to avoid personal liability for private wrongs. In my view, however, the ministerial exception also serves as a structural safeguard against judicial meddling in religious disputes. As a structural safeguard, the ministerial exception protects religious bodies from the suit itself— unlike most affirmative defenses that protect only against liability.

### A.     Affirmative defenses that immunize a party from suit must serve some value of a high order.

The nature of the ministerial exception matters because appellate jurisdiction ordinarily arises only after the district court has entered a final order. 28 U.S.C. § 1291. But some orders warrant earlier appellate review

3

because they concern not just a defense against liability but also a "right not to stand trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). This right exists only rarely, when it's "embodied in a constitutional or statutory provision entitling a party to immunity from suit." *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 874 (1994).

We proceed cautiously when characterizing a defense as a protection from the suit itself rather than just liability. *Will v. Hallock*, 546 U.S. 345, 350 (2006). For this characterization, we consider whether delayed review would "imperil . . . a substantial public interest or some value of a high order." *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 107 (2009) (quoting *Will*, 546 U.S. at 352–53). The Supreme Court has identified values of a "high order" in defenses involving qualified immunity, absolute immunity, Eleventh Amendment immunity, and double jeopardy. *Will*, 546 U.S. at 352. These defenses serve values of a high order like the separation of powers, the efficiency of government, the discretion of governmental officials, the State's dignitary interests, and the mitigation of power imbalances between governmental and private litigants. *Id.* at 352–53.

Consider qualified immunity, which shields government officials from suits for damages unless the official violates a clearly established federal constitutional or statutory right. The Supreme Court treats qualified immunity as "an *immunity from suit* rather than a mere defense to liability" because the costs of litigation "can be peculiarly disruptive of effective

4

government." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis added) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)). Government can be disrupted by

- distracting "officials from their governmental duties,"

- "inhibit[ing] discretionary action," and

- "deterr[ing] . . . able people from public service."

*Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)).

Consider also absolute immunity, which is an affirmative defense that prevents civil liability for official acts by certain governmental actors. *Nixon v. Fitzgerald*, 457 U.S. 731, 744–47, 755 (1982). This affirmative defense stems from the structural separation of powers among the branches of government. *Id.* at 748. Given the importance of this structural protection, the Supreme Court treats absolute immunity as immediately appealable. *Id.* at 742–43; *see also Will*, 546 U.S. at 352 (stating that immediate appealability in *Nixon v. Fitzgerald* was based on concern that delay of an appeal would compromise separation of powers).

And consider Eleventh Amendment immunity, which bars federal suits against states. *P. R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141, 144 (1993). To relieve states of burdensome suits and to ensure vindication of a state's dignitary interests, the Supreme Court treats Eleventh Amendment immunity as immediately appealable,

5

characterizing it as an affirmative defense protecting values of a high order. *Will*, 546 U.S. at 352–53.

A final example involves the Double Jeopardy Clause, which protects an individual from being punished twice for the same offense. *Abney v. United States*, 431 U.S. 651, 661 (1977). Immediate appellate review is needed because the government's prosecutorial power can subject individuals "to embarrassment, expense and ordeal . . . to live in a continuing state of anxiety." *Will*, 546 U.S. at 352 (quoting *Abney*, 431 U.S. at 661–62).

**B.    The ministerial exception protects values of a high order by carrying out a constitutional mandate and preserving the structural separation of church and state.**

The ministerial exception also advances values of a high order, protecting religious bodies from burdensome litigation over religious doctrine and preserving the structural separation of church and state. These values compel courts to resolve application of the ministerial exception at an early stage of the litigation. *Id.* at 350–51.

The unique nature of the ministerial exception stems from its origins in the Free Exercise and Establishment Clauses of the First Amendment, which "protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our*

6

*Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (quoting *Hosanna-Tabor*, 565 U.S. at 186).

The First Amendment's protection extends to religious bodies' employment matters. Without limitations on judicial meddling in employment disputes, religious bodies might skew their employment decisions. For example, a religious body might hesitate to fire a minister even in the face of doctrinal disagreements. "There is the danger that churches, wary of EEOC or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985). The potential cloud of litigation might also affect a religious body's criteria for future vacancies in the ministry. *See EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996).

The ministerial exception not only protects religious bodies from the need to skew their employment decisions, but also advances three structural values:

1.    Protection of a religious body's internal governance

2.    Limitation on governmental power over religious matters

3.    Prevention of judicial encroachment in matters of religion

7

First, in keeping with the Free Exercise Clause, the ministerial exception protects the internal governance of religious bodies by allowing them "to shape [their] own faith[s] and mission[s] through [the religious bodies'] appointments." *Id.* The right to independently make employment decisions "ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,'—is the church's alone." *Id.* at 194–95 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)); *see also Skrzypczak v. Roman Cath. Diocese*, 611 F.3d 1238, 1243 (10th Cir. 2010) ("The ministerial exception preserves a church's 'essential' right to choose the people who will 'preach its values, teach its message, and interpret its doctrines, both to its own membership and to the world at large,' free from the interference of civil employment laws." (quoting *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656 (10th Cir. 2002))).

Second, under the Establishment Clause, the ministerial exception serves as a structural limit on governmental power over religious matters. *See Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 836 (6th Cir. 2015) ("The ministerial exception is a structural limitation imposed on the government by the Religion Clauses."); *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (noting that the ministerial exception "is rooted in constitutional limits on judicial authority"); *see also* John Hart Ely, *Democracy & Distrust:*

8

*A Theory of Judicial Review* 94 (1980) (arguing that the Religion Clauses perform a "structural or separation of powers function"). The Constitution's structural limitation prohibits governmental involvement "in religious leadership disputes." *Conlon*, 777 F.3d at 836; *see also* Peter J. Smith & Robert Tuttle, *Civil Procedure & the Ministerial Exception*, 86 Fordham L. Rev. 1847, 1880–81 (2018) (noting that the ministerial exception is "best understood as an effectuation of the Establishment Clause's limits on governmental authority to decide strictly and purely ecclesiastical matters" (citing *Hosanna-Tabor*, 565 U.S. at 188–89)); Carl H. Esbeck, *The Establishment Clause as a Structural Restraint on Governmental Power*, 84 Iowa L. Rev. 1, 3–4 (1998) (arguing that the Establishment Clause serves as a "structural restraint on the government's power to act on certain matters pertaining to religion").

Third, the ministerial exception confines the judiciary to issues requiring expertise in law, preventing judicial encroachment in matters of religion. *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), *abrogated in part on other grounds*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). By confining courts to legal disputes, the ministerial exception preserves the separation of religious and legal realms, preventing "secular courts [from] taking on

the additional role of religious courts, as if the United States were a theocracy." *Id.*

Given these structural values, three circuits have held that the ministerial exception—unlike most other affirmative defenses—can't be waived. *See Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (concluding that "the Church is not deemed to have waived [the ministerial exception] because the exception is rooted in constitutional limits on judicial authority"); *Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 836 (6th Cir. 2015) (concluding that "the Constitution does not permit private parties to waive the First Amendment's ministerial exception" because "[t]his constitutional protection is . . . structural"); *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) (stating that "the ministerial exception . . . is not subject to waiver or estoppel"), *abrogated in part on other grounds*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). No circuit has reached a contrary conclusion.

The majority argues that the three opinions are distinguishable because they

- didn't address whether the ministerial exception provides immunity from "litigation" (as opposed to immunity from liability),

- addressed only whether a religious body could "waive (or forfeit) a 'ministerial exception defense,'" and

10

- addressed waiver only after explaining that the claimant was a minister.

These purported differences mean little.

The majority is incorrect as to the first purported difference: The Sixth Circuit *did* treat the ministerial exception as a bar against the suit itself. In *Conlon*, the Sixth Circuit concluded that the ministerial exception was no longer waivable because the Supreme Court's opinion in *Hosanna-Tabor* had treated the ministerial exception as a bar to suit rather than just as a defense against liability. *Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829, 836 (6th Cir. 2015) (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 181–89 (2012)); *see* pp. 15–16, below.

The second purported difference fails to consider the courts' reasons for treating the ministerial exception as nonwaivable. In *Lee*, for example, the parties didn't raise the ministerial exception. *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018). But the Third Circuit considered the ministerial exception nonwaivable because it "is rooted in constitutional limits on judicial authority." *Id.* In *Conlon*, the Sixth Circuit interpreted *Hosanna-Tabor* to prevent courts from ever considering the ministerial exception as waived because it "is a structural limitation imposed on the government by the Religion Clauses." *Conlon*, 777 F.3d at 836 (citing *Hosanna-Tabor Evangelical Lutheran Church &*

11

*Sch. v. E.E.O.C.*, 565 U.S. 171, 181–89 (2012)). As the Third and Sixth Circuits explained, they disallowed waiver because of the ministerial exception's structural character.

Finally, the majority states that the three courts discussed the merits (the claimant's status as a minister) before discussing the inability to waive the ministerial exception. This statement is incorrect because *Lee* discussed waiver simultaneously with the merits. *Lee*, 903 F.3d at 118–23. Regardless of the sequence of these issues, however, why would the courts' organization of their opinions render the content distinguishable? The parties didn't raise the ministerial exception in any of these cases, but each circuit held that the court had to address the issue anyway because of its unique structural quality, setting it apart from most other affirmative defenses.

**C.    Because the ministerial exception advances interests of a high order, the issue should be decided early in the litigation.**

The ministerial exception thus protects interests of a high order by maintaining the structural division between religious and governmental realms. Given these important interests, early resolution is necessary to avoid costly, burdensome litigation between religious bodies and their

12

ministers.[4] *See Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (stating that Title VII actions can be lengthy and subject churches to "subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers"); *see also EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) (concluding that the EEOC's two-year investigation into a minister's claim, combined with extensive pretrial inquiries and a trial, "constituted an impermissible entanglement with judgments that fell within the exclusive province of the Department of Canon Law as a pontifical institution"). And early resolution will soften the disruption into a religious body's internal affairs. *See Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 982–83 (7th Cir. 2021) (expressing concern that litigation over the ministerial exception could "protract legal process" and "the very process of inquiry could 'impinge on rights guaranteed by the Religion Clauses'" (quoting *Rayburn*, 772 F.2d at 1171

---

[4]     The majority faults Faith Bible for failing to cite "any case permitting an immediate collateral-order appeal challenging a court's decision to decline to dismiss secular claims based on the Establishment Clause's prohibition against courts' *excessive* entanglement with religion." Maj. Op. at 45 (emphasis in original). But Mr. Tucker hasn't cited any case to the contrary. That's not surprising because this issue is one of first impression; there have been no circuit court cases deciding the issue either way.

(4th Cir. 1985) and *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979))).

### D.    The Supreme Court has characterized the ministerial exception as a bar to the suit (rather than just as a defense against liability).

The Supreme Court held in *Hosanna-Tabor* that the "ministerial exception *bars . . . a suit*" over the religious body's decision to fire the plaintiff. 565 U.S. at 196 (emphasis added).[5] By using the words "bar" and "suit," the Supreme Court has recognized the function of the ministerial exception as a protection against litigation itself (rather than just as a defense against liability).

The majority suggests that I'm putting too much stock in the Supreme Court's choice of a verb (*bar*). But I'm putting little stock in the verb *bar*. The Supreme Court concluded that that the ministerial exception serves to "bar[] . . . a suit." *Hosanna Tabor*, 565 U.S. at 196. Substitute any synonym for *bar*, such as *prevent*. *See* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 103 (3d ed. 2001) ("*Bar* means 'to prevent

---

[5]    Similarly, our court discussed the issue in *Bryce v. Episcopal Church in the Diocese of Colorado*, stating that the ministerial exception "*prevents adjudication* of Title VII cases brought by ministers against churches." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656 (10th Cir. 2002) (emphasis added). The majority argues we cannot rely on *Bryce* because the holding ultimately turned on the church autonomy doctrine. *See* Maj. Op. at 39 n.20. But there we considered the ministerial exception as a part of the church autonomy doctrine. *Id.* at 656.

(often by legal obstacle).'"). The Supreme Court paired this verb with the direct object *suit*, which means "[a]ny proceeding by a party or parties against another in a court of law." *Suit*, *The Black Law Dictionary* (11th ed. 2019). The Supreme Court's language was unmistakable: It characterized the ministerial exception as a defense that would prevent the proceeding itself. I think that we should take the Supreme Court's choice of words at face value, for "a good rule of thumb for reading [the Supreme Court's] decisions is that what they say and what they mean are one and the same." *Mathis v. United States*, 136 S. Ct. 2243, 2254 (2016).

The Sixth Circuit has addressed this aspect of *Hosanna-Tabor*. Prior to *Hosanna-Tabor*, the Sixth Circuit had held that a religious body could waive the ministerial exception. *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 226 (6th Cir. 2007). But the Sixth Circuit later concluded that the ministerial exception was no longer waivable because *Hosanna-Tabor* had treated the ministerial exception as a bar to the suit itself. *Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829, 836 (6th Cir. 2015). For this conclusion, the court drew upon two of *Hosanna-Tabor*'s key passages:

1. "[T]he Establishment Clause . . . *prohibits* government involvement in ecclesiastical matters."

2. "It is '*impermissible* for the government to contradict a church's determination of who can act as its ministers.'"

15

*Id.* (alteration in original) (quoting *Hosanna-Tabor*, 132 S. Ct. at 704, 706).

Despite the Supreme Court's characterization of the ministerial exception as a bar to suit, Mr. Tucker argues that we should not construe the ministerial exception as "a jurisdictional bar." Appellee's Jurisdictional Memorandum at 11. He is correct: The ministerial exception doesn't prevent the district court from hearing the case. So the ministerial exception doesn't prevent jurisdiction over the subject-matter or the parties. In this respect, the ministerial exception resembles other nonjurisdictional defenses like qualified immunity and absolute immunity. *See Nevada v. Hicks*, 533 U.S. 353, 373 (2001) ("There is no authority whatsoever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction . . . ."). Though these affirmative defenses aren't "jurisdictional" *in district court*, they trigger the collateral-order doctrine to create *appellate jurisdiction*. *See* Maj. Op. at 22 (qualified immunity); *id.* at 32 n.14 (absolute immunity).

### E.     These values are not undermined by Mr. Tucker's contrasts with other immunities.

The ministerial exception does bear some differences with other affirmative defenses like qualified immunity and absolute immunity. The primary difference involves waivability: Unlike those immunities, the ministerial exception is considered nonwaivable because of its structural

16

character. *See Hicks*, 533 U.S. at 373; pp. 10–12, above.[6] Mr. Tucker

nonetheless suggests three other differences between the ministerial

exception and other immunities. These differences prove little.

First, Mr. Tucker argues that the ministerial exception does not

provide blanket immunity from all civil liability. He's right about that. *See*

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060

(2020) (stating that the ministerial exception "does not mean that religious

institutions enjoy a general immunity from secular laws"). Religious

bodies remain subject to many civil and criminal laws. *See, e.g.*, *Emp.*

*Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872 (1990) (holding

that the government may enforce neutral and generally applicable laws

despite religious objections).

The ministerial exception involves only an immunity from trial in

*employment* disputes between a religious body and its ministers. *See Our*

*Lady of Guadalupe*, 140 S. Ct. at 2060 ("[The ministerial exception] does

protect their autonomy with respect to . . . the selection of the individuals

who play certain key roles."); *Skrzypczak v. Roman Cath. Diocese*,

611 F.3d 1238, 1246 (10th Cir. 2010) (concluding that the ministerial

---

[6]    The Eleventh Amendment is jurisdictional, *Colby v. Herrick*, 849
F.3d 1273, 1278 (10th Cir. 2017), but it too can be waived. *Sutton v. Utah*
*St. Sch. for the Deaf & Blind*, 173 F.3d 1226, 1233–34 (10th Cir. 1999).
Though waivable, Eleventh Amendment immunity can still trigger the
collateral-order doctrine. *See* pp. 5–6, above.

17

exception bars ministers' pursuit of employment claims). The ministerial exception doesn't shield religious bodies from all secular laws.

Because of this limitation, the majority points out that religious employers can be sued "by non-ministerial employees" for discriminating in employment. Maj. Op. at 35. But this distinction proves little. We protect a religious body's authority over the employment of ministers because of the Religion Clauses. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012) (concluding that the First Amendment elevates the interest of religious bodies in choosing their ministers). So ministerial employees can't sue even though other employees can. The distinction serves the structural purpose of the Religion Clauses, preventing judicial intrusion into a religious body's employment of ministers. *See* Part III(B), above. On the other hand, employment of secular employees doesn't implicate the structural purpose of the Religion Clauses.

Second, Mr. Tucker argues that the benefits from protections like qualified immunity should be reserved for government officials, not private parties.[7] As the majority observes, however, the collateral-order doctrine

---

[7]    Mr. Tucker suggests that the ministerial exception should provide no immunity to religious bodies. But the Supreme Court has rejected that suggestion. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).

applies to private parties as well as governmental parties. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974); *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684 (1950); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)). For example, we've recognized appellate jurisdiction under the collateral-order doctrine when private parties clashed over a state law. *Los Lobos Renewal Power LLC v. Americulture, Inc.*, 885 F.3d 659, 661 (10th Cir. 2018). Other circuits have also applied the collateral-order doctrine to appeals by private parties. *See Black v. Dixie Consumer Prods. LLC*, 835 F.3d 579, 583–84 (6th Cir. 2016) (stating that the Sixth Circuit and other federal appellate courts have frequently applied the collateral-order doctrine to private parties); *see also United States v. Bescond*, 7 F.4th 127, 131 (2d Cir. 2021) (applying the collateral-order doctrine in permitting an interlocutory appeal by a private party on the issue of fugitive status).

Finally, Mr. Tucker urges us to follow the Seventh Circuit Court of Appeals, stating that it has declined to apply the collateral-order doctrine to the ministerial exception. *See Herx v. Diocese of Fort Wayne-South Bend, Inc.*, 772 F.3d 1085 (7th Cir. 2014). As the majority observes, however, the Seventh Circuit didn't address the applicability of the

19

collateral-order doctrine to the ministerial exception. Maj. Op. at 31

(citing *Herx*, 772 F.3d at 1088, 1091 n.1).[8]

In sum, the ministerial exception protects interests like those

advanced by qualified immunity, absolute immunity, and Eleventh

Amendment immunity. For example, the ministerial exception

- protects the First Amendment right of free exercise by insulating religious bodies from costly and burdensome litigation over purely religious decisions on who may serve as a minister and

- functions as a structural limitation, preserving religious independence and the separation of church and state.

These functions distinguish the ministerial exception from other run-of-

the-mill affirmative defenses to liability. Given these differences, the

ministerial exception protects not only against liability but also against the

suit itself.

---

[8] *Herx* lacks any persuasive value because it relied only on the religious body's failure to present "a persuasive case" that the ministerial exception satisfied the collateral-order doctrine. *Herx v. Diocese of Fort Wayne-South Bend, Inc.*, 772 F.3d 1085, 1091 (7th Cir. 2014). For this conclusion, the Seventh Circuit relied on deficiencies in the briefing, stating that the religious body had focused mainly "on the merits," spent "only a few sentences" on jurisdiction, and failed to cite relevant authority. *Id.* at 1090–91. In our appeal, however, the parties have fully briefed the applicability of the collateral-order doctrine.

20

**F.      The majority errs by discounting the value of early judicial review based on unidentified factual disputes.**

When addressing qualified immunity, district courts sometimes deny summary judgment based on factual disputes. *See Sawyers v. Norton*, 962 F.3d 1270, 1281 (10th Cir. 2020). The majority asserts that in this circumstance, the Supreme Court disallows "an immediate appeal" because the costs outweigh the benefits. Maj. Op. at 21–22. Based on this assertion, the majority argues that we should disallow an immediate appeal because the district court denied Faith Bible's motion for summary judgment based on factual disputes. *Id.* at 23–24 n.8.

The majority's argument starts with a faulty premise: The district court didn't identify any factual disputes. So we need *not* disallow "an immediate appeal." The majority disagrees, stating that the court did identify a factual dispute—Mr. Tucker's status as a minister. But status as a minister is a question of law, not fact. *See Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829, 833 (6th Cir. 2015) (stating that "whether the [ministerial] exception attaches at all is a pure question of law"); *Kirby v. Lexington Theol. Seminary*, 426 S.W.3d 597, 608–09 (Kan. 2014) ("[W]e hold the determination of whether an employee of a religious institution is a ministerial employee is a question of law for the

21

trial court, to be handled as a threshold matter.").[9] Granted, the inquiry is fact-dependent and considers the employee's title, qualifications, and responsibilities. But the ultimate question of ministerial status entails a matter of law.

Though the district court found a disagreement over ministerial status, the court didn't identify any evidentiary disputes over Mr. Tucker's title, job, or duties. The court instead referred only to a disagreement as to "the totality of the facts and circumstances of [Mr. Tucker's] employment." Appellant's App'x vol. 1, at 281.

In qualified immunity cases, when the district court doesn't identify any factual disputes, we

- "review the record to determine what facts the district court likely assumed," *Armijo ex rel., Chavez v. Wagon Mound Pub. Schools*, 159 F.3d 1253, 1261 (10th Cir. 1998), and

- "ask *de novo* whether sufficient evidence exists" for a conclusion that the plaintiff overcame qualified immunity, *Lewis v. Tripp*, 604 F.3d 1221, 1228 (10th Cir. 2010).

So when we consider qualified immunity, the district court's reliance on unidentified factual disputes won't prevent application of the collateral-

---

[9]     The majority states that we treated the ministerial exception as a factual question in *Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238, 1243–44 (10th Cir. 2010). In *Skrzypczak*, however, we never addressed whether the ministerial exception involved a matter of law or fact. *See id.* We simply upheld the religious body's motion for summary judgment, considering the evidence as to the claimant's job description and responsibilities. *Id.* at 1243–46.

order doctrine. *Id.* The same is true here: Unidentified factual disputes don't prevent application of the collateral-order doctrine to the ministerial exception.

## IV.    The ministerial exception satisfies the collateral-order doctrine.

Generally, appellate jurisdiction exists only after the district court has issued a final order. 28 U.S.C. § 1291. But we can sometimes deem a narrow class of orders final even if they do not end the litigation. *Gelboim v. Bank of Am. Corp*, 574 U.S. 405, 414 n.5 (2015) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)). These orders are reviewable under the collateral-order doctrine. *Id.*

The collateral-order doctrine contains three elements:

1.    The order conclusively determined an issue.

2.    That issue is completely separate from the merits.

3.    The decision on this issue would be effectively unreviewable after the final judgment.

*Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 664 (10th Cir. 2018). We apply these elements to categories of orders rather than to individual orders, weighing "the inconvenience and costs of piecemeal review" against "the danger of denying justice by delay on the other." *Id.* (quoting *Johnson v. Jones*, 515 U.S. 304, 315 (1995)). "The latter end of that scale has often tipped in favor of constitutionally based immunities." *Id.*

23

Given the district court's ruling and the ministerial exception's interests of a high order, the three elements of the collateral-order doctrine are met.

### 1. The district court's order conclusively determined the applicability of the ministerial exception.

The first element requires a district court's conclusive determination of the issue. *See* pp. 22–23, above. A district court conclusively decides an issue "if it is not subject to later review or revision by the district court." *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 665 (10th Cir. 2018).

The district court's decision conclusively determines the religious body's immunity from suit. If the court were to defer consideration to the end of the case, the religious body would lose its protection from the trial itself. Subjected to suit, the religious body could suffer judicial meddling in religious doctrine, expensive and time-consuming litigation over the content and importance of religious tenets, and blurring of the line between church and state. *See* Part III(B)–(C), above.

Mr. Tucker points out that the religious body could ultimately appeal when the case finishes. But that's also true of qualified immunity, absolute immunity, and Eleventh Amendment immunity. Though the defendants might ultimately prevail based on these immunities, deferral of an appeal

24

would conclusively determine the need to stand trial on the plaintiff's claims. *See Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985).

Mr. Tucker also argues that the district court declined to decide the issue rather than conclusively deny application of the ministerial exception. The district court did say that it was deferring consideration of Mr. Tucker's status as a minister. But the ruling effectively denied Faith Bible's claim to immunity from suit. The ruling on the ministerial exception thus satisfies this element of the collateral-order doctrine. *See id.* at 537 (stating that "the court's denial of summary judgment finally and conclusively determines the defendant's claim of right not to *stand trial* on the plaintiff's allegations" (emphasis in original)).

The majority does not definitively answer whether the first element is satisfied here. Instead, the majority states that the element is likely absent because of genuine issues of disputed fact. But the district court doesn't identify any factual disputes. *See* Part III(F), above. So I would conclude that the district court's order satisfied the first element, conclusively denying Faith Bible's immunity from suit.

2. **The applicability of the ministerial exception is completely separate from the merits of the employment dispute.**

The second element entails complete separation from the merits. *See* pp. 22–23, above. Complete separation exists when the issue differs significantly "from the fact-related legal issues" underlying the merits of

25

the plaintiff's claim. *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 665 (10th Cir. 2018) (quoting *Johnson v. Jones*, 515 U.S. 304, 314 (1995)). The majority finds satisfaction of this element because the ministerial exception presents an important First Amendment issue, which is distinct from the merits of the underlying employment discrimination claim. Maj. Op. at 26. I agree.

### 3.    If an appeal must await entry of a final order, the immunity from suit would become unreviewable.

The third element is satisfied when interlocutory review is needed because the matter would otherwise become unreviewable. *See* pp. 22–23, above.

Mr. Tucker points out that when the district court denies summary judgment on the ministerial exception, the defendant can reassert the issue later, moving for judgment as a matter of law or even filing a post-judgment motion. But that's true of other defenses like qualified immunity or absolute immunity.

Though appellate courts can address the ministerial exception (like qualified immunity or absolute immunity) at the end of the case, deferral of the appeal could subject the religious body to burdensome discovery, trial, and post-judgment motions. The eventual ability to appeal would thus come at a cost, protecting the religious body from liability but not from the suit itself. *See* Part III(B)–(C), above.

26

\* \* \*

For these reasons, the denial of the ministerial exception on summary judgment satisfies the collateral-order doctrine. We thus have jurisdiction.

## V.    I would conduct de novo review of the denial of summary judgment.

On the merits, we should conduct de novo review. *Skrzypczak v. Roman Cath. Diocese*, 611 F.3d 1238, 1243 (10th Cir. 2010). For this review, we consider the evidence in the light most favorable to the nonmoving party (Mr. Tucker). *Id.* Summary judgment would be appropriate if "there is no genuine issue as to any material fact" and the movant (Faith Bible) "is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)).

When applying this standard to assess qualified immunity, we credit the district court's assessment of facts that a reasonable jury could find. *See Estate of Booker v. Gomez*, 745 F.3d 405, 409 (10th Cir. 2014). I would follow this approach, determining whether Mr. Tucker was a minister based on the district court's assessment of facts that a reasonable jury could have found.

## VI.    The ministerial exception applies as a matter of law.

The ministerial exception bars courts from considering an employment claim brought by a minister against a religious body. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020).

27

The parties do not dispute that Faith Bible is a religious body. So we need only consider whether Mr. Tucker was working as a minister.

## A.   Multiple factors bear on his status as a minister.

No rigid formula exists for determining whether an employee worked as a minister. *Hosanna-Tabor Evangelical Church & Sch. v. EEOC.*, 565 U.S. 171, 190 (2012). Without a rigid formula, we must consider the Supreme Court's two cases involving teachers at religious schools: *Hosanna-Tabor* and *Our Lady of Guadalupe*.

In *Hosanna-Tabor*, the Supreme Court considered four factors to characterize a religious school's teacher as a minister:

1.   whether the school had held the teacher out as a minister,

2.   what the teacher's title had been and what her religious education had entailed,

3.   whether the teacher had held herself out as a minister, and

4.   what the teacher's job responsibilities had been.

*Id.* at 191–92. In applying these factors, the Court observed that the school had held the teacher out as a minister, that she had retained the title of a "commissioned minister," that she had identified as a minister "call[ed] to religious service," and that her duties had "reflected a role in conveying the Church's message and carrying out its mission." *Id.* Given these circumstances, the Court regarded the teacher as a minister. *Id.*

28

In *Our Lady of Guadalupe*, the Supreme Court regarded two teachers at a religious school as ministers. 140 S. Ct. at 2049. The Court clarified that "a variety of factors may be important," including factors beyond those considered in *Hosanna-Tabor*. *Id.* at 2063. The importance of the factors will vary from case to case. *Id.* And the "religious institution's explanation [of an employee's role] in the life of the religion in question is important," but not dispositive. *Id.* at 2066. "What matters," the Court explained, "is *what an employee does*." *Id.* at 2064 (emphasis added). The Court explained that teachers at religious schools often act as ministers when fulfilling the school's mission of instructing students in matters of faith:

> The religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work live at the core of their mission. Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

*Id.* at 2055.

In determining that the two teachers had worked as ministers, the Court considered three factors:

1.    "[T]hey both [had] performed vital religious duties."

2.    They had been "obliged to provide instruction about the Catholic faith" and "to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith."

29

3.    The religious school [had] "expressly [seen the two teachers] as playing a vital part in carrying out the mission of the church."

*Id.* at 2066.

Relying on *Hosanna-Tabor* and *Our Lady of Guadalupe*, Faith Bible argues that Mr. Tucker worked as a minister in his capacities as a teacher and as a Director of Student Life/Chaplain.[10] In addressing this argument, we credit the district court's assessment of the facts that a reasonable jury could have found. *See Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013). The district court concluded that a reasonable jury could have found that under Mr. Tucker's version, he hadn't acted as a minister. Appellant's App'x vol. 1, at 284. So I would credit Mr. Tucker's version and other undisputed facts as summarized in the district court's order. *Id.* at 277–82, ¶¶ 1–17.

---

[10]    Mr. Tucker had lost his position as a Director of Student Life/Chaplain before his employment at the school came to an end. For about a month, he had served only as a teacher. *See* Part I, above.

The change led the panel to ask the parties about the pertinent time-period for the ministerial exception. Was it (1) when Mr. Tucker was a director/chaplain and a teacher or (2) when he was just a teacher? I would not decide this issue because Mr. Tucker acted as a minister in both time-periods. *See* Part VI(B)–(C), below.

**B.    As a Director of Student Life/Chaplain, Mr. Tucker was a minister.**

Under Mr. Tucker's version and other undisputed facts, he qualified as a minister in his role as Director of Student Life/Chaplain.

Mr. Tucker testified that he had held himself out to the students not only as "the Director of Student Life," but also as the "Chaplain." *Id.* at 373. As the Chaplain, Mr. Tucker had acknowledged focusing on the students' "physical, rational, and spiritual wellbeing." *Id.* His focus on spiritual wellbeing is reflected in

- his title and training,

- the school's explanation to Mr. Tucker of his role, and

- his responsibilities.

*Title and Training*

From August 2014 to January 2018, Mr. Tucker served as a Director of Student Life/Chaplain at Faith Christian Academy. Appellant's App'x vol. 1, at 278. The parties dispute whether

- Mr. Tucker had the primary title of "Director of Student Life" or "Chaplain" and

- Faith Bible told Mr. Tucker that he was not a minister for tax purposes.

Though Mr. Tucker disputes his primary title, he described his position as "Director of Student Life/Chaplain" and admitted that his employment contract and extensions had referred to his job as "Chaplain."

31

*Id.* at 208–09, 271, 277, 280. These references bear significance because the Supreme Court has considered job titles in determining the ministerial status. *Our Lady of Guadalupe*, 140 S. Ct. at 2056–57; *Hosanna-Tabor*, 565 U.S. at 191. Mr. Tucker's title as Chaplain reflects religious leadership.

*The School's Explanation of Mr. Tucker's Role*

The school's explanation of Mr. Tucker's role, though not dispositive, is "important." *Our Lady of Guadalupe*, 140 S. Ct. at 2066.

In 2017, Mr. Tucker signed the school's Extension Agreement for the position of Chaplain. The agreement states:

> The Superintendent of Faith Christian Academy . . . discussed with Employee the necessity that the hand of the Lord be on Employee and that he/she exhibits the gift necessary to perform in the position of Chaplain. Employee expressed his/her belief that he/she has this gift and that God has called him/her to minister this gift at [the school].

Appellant's App'x vol. 1, at 99, 275.

Under the extension agreement, the school required that the "hand of the Lord" be on Mr. Tucker as its "Chaplain." Mr. Tucker thus accepted a call to minister to the school community, and the school held Mr. Tucker out as a religious leader.

32

*Responsibilities*

As a Director of Student Life/Chaplain, Mr. Tucker bore responsibility for religious leadership. He emphasizes that these responsibilities included

- organization of "religiously oriented" chapel services,

- spiritual guidance and counseling,

- endorsement of Christianity,

- integration of "a Christian worldview" in his teaching,

- "a passionate relationship with Jesus Christ," and

- assistance to students in developing their relationships with Jesus Christ.

Appellee's Jurisdictional Memorandum at 3, 5; Appellee's Resp. Br. at 47. These characterizations are supported by the summary-judgment record, which showed Mr. Tucker's organization of "weekly chapel meetings" consisting of "'assemblies or symposiums'" where people with a variety of religious or nonreligious perspectives would address "matters of interest at the school." Appellant's App'x vol. 1, at 281.

The chapels included some secular activities, like "announcements, awards, rallies, student election speeches, and other ordinary high school-related matters." *Id.* But Mr. Tucker describes the chapels as "religiously-oriented discussion groups." Appellee's Jurisdictional Memorandum at 3.

In a presentation to students, Mr. Tucker described his duties as "the physical, relational, and spiritual wellbeing" of students and planning "chapels, retreats, outreach projects, and student mentoring opportunities that are designed to provide opportunities for student spiritual growth." Appellant's App'x vol. 1, at 271.

Mr. Tucker's extension agreement also required obedience to scripture and attendance at prayer sessions and church services. *Id.* at 100, 275. Though Mr. Tucker had some secular duties as a Director of Student Life/Chaplain, many aspects of his work were religious. *See Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 362–63 (8th Cir. 1991) (stating that the position of "Chaplain" was "primarily a 'ministerial' position" despite the performance of some "secular activities in that role"); *see also Hosanna-Tabor*, 565 U.S. at 193 (rejecting the argument that ministers "perform exclusively religious functions" because "heads of congregations themselves often have a mix of duties, including secular ones"). Mr. Tucker had to organize religiously-oriented chapels and discussion groups "designed to provide opportunities for student spiritual growth." Appellant's App'x vol. 1, at 271. He was also responsible for spiritual counseling.

* * *

34

Based on all of the circumstances, I would conclude that the undisputed facts show that Mr. Tucker acted as a minister in his capacity as a Director of Student Life/Chaplain.

**C.    Mr. Tucker also served as a minister in his role as a teacher.**

Mr. Tucker also qualified as a minister in his role as a teacher.

*Title and Training*

Mr. Tucker not only served as a Director of Student Life/Chaplain but also taught at the school from August 2000 to July 2006 and August 2010 to February 2018. *Id.* at 278–279. The school's handbook gave teachers the title of "minister." *Id.* at 276.

The title as a minister reflected "a significant degree of religious training." *Hosanna-Tabor*, 565 U.S. at 191. When Mr. Tucker applied as a teacher, he stressed his credentials in the ministry, stating that

- he had participated in Campus Ministry, Campus Crusade for Christ, Young Life International, and Malibu Presbyterian college group leadership and worship team,

- he had worked "extensive[ly] . . . in ministry,"

- he was "a dedicated Christian," and

- he had a "Christian philosophy of education."

Appellant's App'x vol. 2, at 471. His asserted credentials bore the traditional hallmarks of a job in the ministry.

In his declaration, Mr. Tucker denies "specific training in the Bible" in comparison to teachers who taught "Bible" as a subject. Appellant's

35

App'x vol. 1 at 206. But his own emphasis of his religious background and relevant credentials reflects an awareness of his religious duties. *See Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 659–60 (7th Cir. 2018) (concluding that the ministerial exception was supported by a teacher's touting of her experience in teaching religion).

Mr. Tucker insists that no religious training was required for his job. But the Supreme Court has stated that the ministerial exception doesn't require religious training. In *Our Lady of Guadalupe*, for example, the Supreme Court found satisfaction of the ministerial exception despite the claimant's "limited formal religious training." 140 S. Ct. at 2058. The Court explained that insistence "on rigid academic requirements could have a distorting effect" because "religious traditions may differ in the degree of formal religious training thought to be needed in order to teach." *Id*. at 2064. So the absence of requirements for religious training would not prevent application of the ministerial exception.

*The School's Explanation of Mr. Tucker's Role*

The teacher handbook also reflects the religious character of the job:

To become a teacher or full time worker at Faith Christian Academy is a calling from the Lord Jesus Christ to minister. You are joining this ministry, not as an employee, but as a minister to [the school's] students and families. [The school]'s ministry focus emphasizes the following items:

1. *[The school] desires to provide an academic program that is based on the scriptural principles found in the Word of God, the Holy Bible.* [Academy] teachers are committed to the

36

integration of biblical truth within each academic and extra-curricular discipline.[11] Additionally, teachers are responsible to facilitate godly character development, teach good study habits and encourage academic excellence. Each teacher must be thoroughly prepared and use effective instructional methods and techniques.

2. *Although [the school] is a Christian academic institution, an additional emphasis is placed upon the spiritual life of all students.* [The school]'s desire is to train and lead students into attitudes and habits, which will bring them to Christ-like maturity. *This includes encouraging all students to develop a prayer life, a passion to share to [sic] Gospel message, and characteristics such as honesty, humility, purity, faithfulness, love, and service. . . .*[12]

3. *All staff members must be aware of the importance of our ministry to one another. Each teacher needs to be open to the Holy Spirit to offer words of encouragement, prayer, and concern for one another.* It is important that teachers be willing to work as a team, make and receive positive suggestions, stand, as much as possible, with fellow teachers (especially in times of hardship), and guard the reputation of others. Trusting in the Lord in areas of personal needs as well as school needs and looking to Him as the primary source of wisdom, help, knowledge, and strength is critical.

Appellant's App'x vol. 1, at 109, 276 (emphasis added).

---

[11]   Mr. Tucker's declaration echoes his understanding that he was instructed to "'integrate' a Christian worldview into my teaching." Appellant's App'x vol. 1. at 207.

[12]   The omitted portion of this quotation addresses whether staff members must guide "students who may not yet be born again" toward "an abiding relationship with Christ." Mr. Tucker states that he was told to let doubting students address their concerns with parents or pastors. Appellant's App'x vol. 1, at 208. So we do not rely on this portion of the handbook.

Given the school's explanation of teachers' roles, the qualifications

included religious dedication. For example, when Mr. Tucker applied, he

had to say "[w]ithout mental or other reservation" that he believed in

- the divine inspiration and infallibility of the Bible,

- the existence of one God in the persons of God the Father, God the Son, and God the Holy Spirit,

- the virgin birth,

- the Lord Jesus Christ's deity, sinless humanity, atoning death, bodily resurrection, ascension to his Father's right hand, and future return in power and glory,

- the need for every person to receive the gift of eternal life from Jesus Christ in order to reach heaven,

- the ministry of the Holy Spirit,

- the church as the spiritual body headed by Christ,

- the principle of baptism through immersion, and

- the eternal existence of all people in heaven or hell.

Appellant's App'x vol. 2, at 419. These requirements reflect Faith Bible's

consideration of teachers as religious leaders.

*Responsibilities*

Although Mr. Tucker referred to himself as a teacher rather than a

minister, he taught at a Bible-based religious school. So he taught not only

science, a secular subject, but also two classes in the Bible Department

38

called "Leadership" and "Worldviews and World Religions." And Mr.

Tucker's duties as a teacher included four religious responsibilities:

1. "Live in a vital relationship with God (Father, Son and Holy Spirit) as [the teacher] communicate[s] with Him through prayer and the Scriptures. John 15, Col. 3:25."

2. "Demonstrate daily a relationship with Jesus that is filled with grace and truth. John 1:14."

3. "To the greatest extent possible, live at peace with all, abstain from all appearance of evil, and refrain from gossip. Romans 12:18, 1 Thessalonians 5:16–18 & Proverbs 26:20."

4. "Discern and follow the leading of the Holy Spirit throughout the day. Gal. 5:16–18."

*Id.* at 213; *see also Our Lady of Guadalupe*, 140 S. Ct. at 2065 (noting that

teachers at religious schools often perform religious functions). These

religious responsibilities support ministerial status. *See Fratello v.*

*Archdiocese of N.Y.*, 863 F.3d 190, 208 (2d Cir. 2017) (concluding that the

substance of a lay principal's duties supported the ministerial exception

because they entailed "proficiency in religious leadership").

We address not only Mr. Tucker's responsibilities but also the

criteria used to evaluate his performance in determining his ministerial

status. *Our Lady of Guadalupe*, 140 S. Ct. at 2057; *Hosanna-Tabor*, 565

U.S. at 191. Mr. Tucker acknowledges that these criteria included

consideration of his use of biblical principles and exhortation for his

students to engage in worship and service. Appellant's App'x vol. 1,

at 208, 216 ("The staff member consistently illuminates Biblical principals

39

[sic] related to course material in a manner which leads students to evaluate their personal worldview and/or challenges them to respond via worship, service, etc.").

Mr. Tucker points out that he didn't need to promote any particular Christian beliefs over others.[13] He cites an out–of–circuit case, *Dole v. Shenandoah Baptist*, in arguing that teaching "all classes . . . from a pervasively religious perspective" and "subscrib[ing] to the Shenandoah statement of faith" were insufficient to trigger the ministerial exception. 899 F.2d 1329, 1396 (4th Cir. 1990).

*Dole* isn't persuasive because it preceded *Hosanna-Tabor* and *Our Lady of Guadalupe*. Given the guidance from *Hosanna-Tabor* and *Our Lady of Guadalupe*, a court would need to consider Mr. Tucker's obligation to teach from a Christian perspective, one that endorsed Christianity's "worldview," "integrate[d] a Christian worldview in his teachings," and "endorse[d] Christianity in general terms." Appellant's App'x vol. 1 at 279–80; *see Hosanna-Tabor*, 565 U.S. at 192; *Our Lady of Guadalupe*, 140 S. Ct. at 2066. But Mr. Tucker went even further, for he acknowledged that his "main goal" was to educate students "to help them become more like Jesus Christ" because Christ was the "center" of his students'

---

[13]    He also asserts that school officials told him not to teach particular doctrines. For this assertion, he presents no evidence.

40

education. Appellant's App'x, vol. 2, at 320. Mr. Tucker's stated goals support ministerial status.

### D. The alleged denial of a tax benefit doesn't prevent application of the ministerial exception.

On appeal, Mr. Tucker argues that a factual issue existed because Faith Bible had denied a tax benefit to him on the ground that he wasn't a minister. Mr. Tucker's appellate brief contained a single sentence addressing the issue, stating: "[W]hen he asked the School about a tax benefit available to ministers, he was expressly told he 'did not qualify because [he] was not a minister.'" Appellee's Corrected Resp. Br. at 45 (quoting Appellant's App'x vol. 1, at 210).[14] This sentence does not supply a meaningful reason to question Mr. Tucker's status as a minister. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1122 n.7 (10th Cir. 2014) (noting that issues not adequately briefed will not be considered on appeal).

Even if we were to consider this assertion, it would not prevent summary judgment. Under the federal tax code, taxpayers enjoy a tax deduction if they

- qualify as "minister[s] of the gospel" and

---

[14]    In this sentence, Mr. Tucker cites his statement of facts, where he said: "At one point, Tucker inquired about whether he could take a parsonage allowance and he was told he could not." Appellant's App'x vol. 1, at 173.

- obtain compensation consisting of rental allowances or the rental value of the homes furnished to them as part of their salary.

26 U.S. § 107.

The requirements differ for the ministerial exception and the tax deduction. *See* Sally R. Wagenmaker, Ryan Oberly, & Paul Wintors, *Religious Tax Reclassification for Public Charities*, 33 Taxation of Exempts 34, 40 (2022) (stating that the requirements differ significantly for the ministerial exception and status under the tax code as a minister of the gospel). For example, status as a "minister of the gospel" requires an ordination, a commission, or a license "to perform sacerdotal functions." *Kirk v. Commissioner*, 425 F.3d 492, 495 (D.C. Cir. 1970). No such requirement exists for the ministerial exception. *See Alice-Hernandez v. Cath. Bishop of Chi.*, 320 F.3d 698, 703 (7th Cir. 2003) ("In determining whether an employee is considered a minister for the purposes of applying [the ministerial] exception, we do not look to ordination but instead to the function of the position."); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 958 (9th Cir. 2004) (concluding that ordination is not required for the ministerial exception).

Even if Mr. Tucker were a "minister of the gospel" under the tax code, the tax deduction would be available only if his compensation package included free housing or a rental allowance. And he hasn't alleged either free housing or a rental allowance. So Mr. Tucker's asserted

42

ineligibility for the tax deduction lacks any bearing on application of the ministerial exception.

* * *

A religious body may be entitled to summary judgment under the ministerial exception even when the pertinent factors cut both ways. *See, e.g.*, *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 661 (7th Cir. 2018) (concluding that a religious body was entitled to summary judgment under the ministerial exception when "at most two of the four *Hosanna-Tabor* factors are present"); *Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829, 835 (6th Cir. 2015) (stating that the court didn't need to consider two factors because the "ministerial exception clearly applies" when "formal title and religious function . . . are present"). Here, though, all of the factors support application of the ministerial exception. Mr. Tucker bore the titles of chaplain and teacher: The job title "Chaplain" reflected a role as spiritual leader, and the school's handbook regarded teachers as ministers. Mr. Tucker's role as a religious leader was apparent not only from his job titles but also in his responsibilities as the Director of Student Life/Chaplain and as a teacher. And he touted his religious experience when applying for a job. Given the prominent role of religion in Mr. Tucker's positions, he would qualify as a minister even under his version of the facts.

43

## VII. Conclusion

I would conclude that

- jurisdiction exists under the collateral-order doctrine and

- Faith Bible enjoyed immunity under the ministerial exception.

Given these circumstances, I would reverse the denial of Faith Bible's motion for summary judgment.[15]

---

[15] The parties agree that this conclusion applies equally to the claims under Title VII and Colorado law. *See* Maj. Op. at 9-10 n.2.